2020 IL App (1st) 161643

No. 1-16-1643

Opinion filed June 16, 2020.

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 89 CR 14118 |
| | ) | |
| JUAN AGUILAR, | ) | The Honorable |
| | ) | Alfredo Maldonado |
| Defendant-Appellant. | ) | and Earl E. Strayhorn, |
| | ) | Judges Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justices Pucinski and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant Juan Aguilar was convicted of aggravated criminal sexual assault. Although a Spanish interpreter assisted him during the presentation of evidence, the record does not show an interpreter was present when the court announced its finding of guilt and advised defendant that he could be sentenced *in absentia* if he failed to appear at sentencing. Defendant was later sentenced *in absentia* to 30 years in prison and ultimately sought relief under the Post-Conviction Hearing Act (Act). 725 ILCS 5/122-1 *et seq.* (West 2016).

¶ 2     On appeal, defendant asserts that the summary dismissal of his petition filed under the Act was improper because he alleged the gist of a constitutional claim that he was denied his due process right to be present when the trial court, without the assistance of an interpreter, pronounced him guilty and admonished him that he could be sentenced *in absentia*. He also contends he was denied the right to be present at sentencing. Additionally, he contends that, when he finally reappeared before the court more than a decade after being convicted and sentenced, appointed counsel failed to advise him he could seek a new sentencing hearing pursuant to the Code of Criminal Procedure of 1963 (725 ILCS 5/115-4.1(e) (West 2004)). We find defendant alleged the gist of a constitutional claim that his right to be present was violated when the trial court, without the assistance of an interpreter, pronounced him guilty. Accordingly, we reverse and remand for further proceedings under the Act.

¶ 3                                    I. Background

¶ 4     Given the unusual circumstances that led up to the filing of the petition at issue on appeal, we recite the facts of this case in some detail.

¶ 5                                    A. Trial

¶ 6     In 1989, defendant was charged with one count of aggravated criminal sexual assault, three counts of criminal sexual assault, and one count of aggravated criminal sexual abuse. The charges were based on contact between defendant's penis and the vagina of R.M., a minor. During pretrial proceedings, defense counsel, Ken Del Valle, told the trial court that defendant did not speak English, although he occasionally waived the presence of an interpreter before trial commenced. When trial began on January 8, 1991, Del Valle reiterated that defendant did not speak English and stated that he needed an interpreter. That interpreter was present throughout the presentation of evidence.

¶ 7        The victim, R.M., also required assistance because she was "brain damaged" and had developed her own language with her mother and sister. Del Valle initially objected to having R.M.'s mother act as her interpreter, but the court overruled that objection. After R.M. was questioned to ascertain her competency as a witness, Del Valle was satisfied that R.M. was competent and had no problem "with her mother remaining by her side." We note that, even with the assistance of R.M.'s mother, the parties struggled to make a clear record.

¶ 8        R.M. testified that on June 13, 1989, she lived with her mother Cindy and her sister Michelle, although R.M. did not know if Michelle was older or younger than her. That day, R.M. was outside with her friend Melissa. When asked what they were doing outside, R.M. testified, "[h]e humped me." R.M. subsequently explained that Melissa took her to a house in the neighborhood.[1] Additionally, a boy took R.M. inside while Melissa stayed outside. Downstairs, a boy held R.M.'s arms tight while she lay on the floor. R.M.'s subsequent testimony was inconsistent regarding the number of boys present and whether she was in a basement.

> "Q. What happened to you, [R.M.]?
>
> A. That boy here (indicating).
>
> Q. What was he doing to you?
>
> A. He hold me.
>
> Q. He was holding you?
>
> A. Yes."

She testified that while defendant held her arms, "[t]hey humped." She later testified, however, that only one boy was with her.

---

[1]We note it appears that the house had been divided into apartments.

¶ 9      When R.M. went home, she encountered Michelle and her friend Charles. She then brought them to the house where the incident occurred and saw the male who humped her as well as the male who held her arms down. She told Michelle that "that was the guy." Subsequently, R.M. showed the police the house in question.

> "Q. Did you show the police the guy who you said was there?
>
> A. Yes.
>
> Q. Now, the guy that you showed the police, is he in this courtroom now?
>
> A. No.
>
> Q. Did you tell the police officers who it was that held your arms down?
>
> CINDY [(VICTIM'S MOTHER)]: She doesn't know what courtroom is.
>
> A. No. Yes."

Neither the attorneys nor the court sought clarification.

¶ 10      On cross-examination, the following ensued:

> "Q. Who took you into that basement?
>
> A. That guy.
>
> Q. But not that guy, right?
>
> A. No."

R.M. further testified that, when she returned to the house where the incident occurred, she told Michelle "*something* about that man (indicating)." (Emphasis added.) Additionally, the second time she went to the house was the first time she had seen "that man." R.M. later reiterated that she was with Michelle when she first saw defendant. Furthermore, Michelle had pointed him out to R.M. and told her that "this is the guy."

¶ 11    On redirect examination, R.M. testified that she saw "him" when she brought Michelle to the house and again when the police went to the house. When later asked if she had seen the person who held her hands down, she answered, "Him (indicating)."

¶ 12    When the trial court asked R.M. who had hurt her, she answered, "The man that not here."

¶ 13    Michelle testified that, at the time of the incident, she was 15 years old and R.M. was 13 or 14 years old. R.M. had returned home looking scared and holding her underwear. She said she was "humped" and indicated to her groin. Subsequently, R.M. showed Michelle and her friend Charles the house where R.M. had been hurt. They ultimately gained entry when a male individual walked down the stairs. As Charles spoke to him, Michelle and R.M. went to an upstairs apartment, where R.M. looked around.

¶ 14    Michelle spoke to two males, who were playing dominos. She asked, "Where is the guy that humped my sister?" R.M. asked, "Where is he?" One of the individuals answered in English that the person Michelle was looking for was not present. Michelle testified that she and R.M. had not been looking for the person who held R.M.'s arms down because R.M. had not yet mentioned that this had occurred. During Michelle's testimony, she initially indicated that only one of the males had spoken. When the state's attorney subsequently asked, "You spoke English and *they* spoke English" (emphasis added), Michelle answered, "right."

¶ 15    The sisters and Charles returned home to call the police. When at least one police officer arrived, R.M. showed him the house and told him what happened. Eight to ten people were then lined up on the porch, and R.M. pointed defendant out as someone who was present at the incident.

¶ 16    Nurse Loretta Bogolin testified that, when she examined R.M. at the hospital, R.M. said she was sexually assaulted and pointed to her vaginal area. Her hymen was torn and bruised, and semen was present.

¶ 17    Detective Kenneth De Falco testified that at about 10:15 p.m. on the night in question, he interviewed Michelle and Charles. R.M. was also present. Subsequently, Detective De Falco went to a two-story residence where seven or eight men were standing outside on their own volition. According to De Falco, R.M. identified defendant as having been present during the offense. Although Detective De Falco testified that R.M. was positive in her identification, R.M. also identified defendant's cousin as having been present and he was not charged. Additionally, R.M. told Detective De Falco that defendant held her hands down while another Hispanic male humped her.

¶ 18    Following Detective De Falco's testimony, defense counsel moved to suppress evidence of the identification at the scene because the State had never disclosed it and it was otherwise improper. The court denied that motion as well as defendant's motion for a directed verdict.

¶ 19    Defendant testified on his own behalf that on June 13, 1989, he had only just arrived in the United States from Mexico two months before. On that day, he arrived home from work at about 6 or 6:30 p.m. and did not leave his second-floor apartment again. He took a bath and played dominos with Ramero Aguilar, his cousin. Jose Lopez and Roberto Sanchez joined them from about 7:30 p.m. to 9:30 p.m. When defendant and Ramero were playing dominos at about 9:45 or 10 p.m., R.M. came in with her sister and a young man. The visitors "were asking for something, but we didn't know what it was," as the visitors spoke only in English. Defendant denied speaking to anyone in English. After 5 to 10 minutes, the visitors left. He had never seen them before that encounter.

¶ 20    Defendant and Ramero watched television until about 10:30 p.m., when the police knocked on the door and ordered them in Spanish to come outside. Eight to ten men gathered on the porch. Although defendant initially testified that everyone was on the porch because it was a warm night, he subsequently testified that the police had ordered him to come downstairs. Both R.M. and Michelle pointed to him, but he did not know what was being said because they spoke in English. Furthermore, both he and Ramero were arrested.

¶ 21    Ramero testified that, on the day in question, he and defendant went to work together, came home together at about 6 p.m. or 6:30 p.m., and then played dominos together. Lopez and Sanchez joined them later. Between 9:30 and 10 p.m., two women and a man arrived. Ramero did not understand their questions. Additionally, Jorge Orozco, who spoke a little English, came upstairs when the visitors arrived. After the visitors left, Ramero and defendant played dominos and watched television until about 10:30 p.m. The police then knocked on the door and asked everyone in the house to come outside. Michelle pointed out Ramero and defendant, who were arrested. The police released Ramero after 24 hours, however.

¶ 22    Orozco testified that at about 9:30 or 9:45 p.m. on June 13, 1989, he went upstairs because two girls and a white male arrived and spoke loudly. Orozco, who spoke a little English, testified that those individuals were looking for a man, but they never asked about defendant or Ramero. After 8 to 10 minutes, the visitors left, and Orozco returned downstairs. At about 10:30 p.m., the police ordered everyone to come outside. The police, accompanied by the girls who had been there earlier, were looking for a particular man.

¶ 23    Lopez testified that, on the day in question, he arrived home at about 6:30 p.m., saw defendant and Ramero upstairs at about 7 p.m., and played dominos with them until 9:30 p.m.

On his way back downstairs, he saw two females and a male. At about 10:30 p.m., the police knocked on the door and ordered everyone to come outside.

¶ 24     At the close of evidence, the trial court indicated it was troubled because the State charged defendant as a principal, rather than as an accomplice, but the evidence did not show he inserted his penis into R.M.'s vagina. The court gave the State time to show that defendant could nonetheless be found guilty under an accountability theory.

¶ 25     After several continuances, the parties appeared for the court's ruling on May 13, 1991. Del Valle argued that defendant was innocent and stated:

"When we were here at trial, I told [ASA] Evelyn Clay I know who did this, I would testify against that man, I will be your witness. In my investigation of this case, here is the guy who did it. Nothing happened.

Now, Judge, this is an innocent guy. When I told the State's Attorney that during the course of my investigation I know who the culprit is, that I will testify against the culprit because my conversations with that individual were not attorney/client, I expect some type of consideration, some type of response."

Neither the State nor the court asked Del Valle any follow-up questions.

¶ 26     The trial court then found defendant guilty under an accountability theory. The court also stated:

"I am going to let him remain at liberty on the bond, with the understanding that if he does not return here on June 14th to receive the judgment of this Court or the sentence of this Court, the Court will continue the matter for two court dates, and then thereafter sentence him in his absence."

Although defendant was apparently present, the record does not indicate that an interpreter was present.

¶ 27     Defendant failed to appear on subsequent court dates. On June 21, 1991, the court noted that it had permitted defendant "to remain at liberty on his bail but advised him of the requirement that he could subject himself to being sentenced in his absence if he failed to appear in court on June 14th to receive the sentence of this Court." Del Valle then stated, "I called my client's house and I talked to some of his relatives and they advised me that he had gone to Mexico basically out of fear of going to jail." Following argument, the court denied defendant's motion for a new trial and proceeded to sentencing:

"MR. DEL VALLE [(DEFENSE COUNSEL)]: The [fact that he's] not here, I am as disappointed. I am more disappointed than anybody else because I wasn't doing this for the CBR, but this is a kid who has always, always, always maintained his innocence; not just that, they couldn't find him guilty but innocent. It is not that they didn't prove it. This kid was innocent, innocent, innocent. And when I talked to him after the trial, I told him I said, 'Well, I am pretty sure we can probably win an appeal on various issues here but you would have to do some time in jail a little bit and he said—his statement to me was 'if I had done it, I would go in, no problem.' But he said, 'I am not going to stick around for something I didn't do.'

MR. KELECIUS [(ASSISTANT STATE'S ATTORNEY)]: This is not mitigation.

THE COURT: Overruled.

MR. DEL VALLE: You are right. It's not mitigation but I am trying to explain to you why he is not here. He felt very strongly about that and I told him I said 'well, you

have to be here. I think your best shot is to be here' and I said—as a matter of fact, I

thought that we could probably get this reduced if he were here today and get something

probationable but I told him there was a very very good chance of that based on the facts

of this case and he is not here and I called his home on the day I left court and they told

me that he had probably gone to Mexico. They were very vague about it, but that's

basically my understanding about it."

The court then sentenced defendant to 30 years in prison for aggravated criminal sexual assault

and found the remaining counts merged. Defendant's direct appeal was ultimately dismissed on

the State's motion.[2]

¶ 28                                    B. 2004 Proceedings

¶ 29    The warrant for defendant's arrest was executed, and defendant found himself back in

court, with assistance from an interpreter, on October 21, 2004. When the case was called the

next day, the sheriff said, "Mr. Aguilar now claims he doesn't speak English. And he's been

speaking fine all day." Notwithstanding the sheriff's statement, the case was continued for an

interpreter to be present. Assistant Public Defender Margaret Domin and an interpreter

subsequently appeared on defendant's behalf. On November 1, 2004, Domin stated, "defendant

informed me his father died. And that is why he did not appear for sentencing." The trial court

then issued the mittimus and defendant was taken to the Department of Corrections.

¶ 30                                    C. Proceedings Under the Act

---

[2]The order dismissing defendant's direct appeal is not included in our record, but the State surmised at oral arguments that the appeal was dismissed pursuant to the fugitive rule. Defendant's postconviction petition similarly alleges that the appeal was dismissed due to his absence. See *People v. Parada*, 2020 IL App (1st) 161987, ¶ 25 (stating that dismissals under the fugitive rule are without prejudice and that an appeal may be reinstated upon proper motion when the fugitive voluntarily returns to the appellate court's jurisdiction).

¶ 31     In January 2016, defendant filed a *pro se* petition under the Act, alleging that no interpreter was present on May 13, 1991, when (1) the court found defendant guilty, (2) the court admonished him that he could be sentenced *in absentia*, and (3) Del Valle told the court he knew the perpetrator's identity. Defendant alleged that, as a result, his constitutional right to be present was violated. He also alleged that Del Valle had given him permission to travel to Mexico to be present for the death of his father. In addition, defendant's attempts to contact Del Valle upon his return to the United States were unsuccessful, and defendant later learned that Del Valle had moved to Texas. Furthermore, Domin informed the court in 2004 that defendant said he did not appear for sentencing due to his father's death. In 2005, defendant hired Robert Louis Rascia to represent him. After eight years, Rascia had filed nothing on defendant's behalf.[3] Defendant unsuccessfully sought representation from attorney Raul Villalobos in 2015. In a letter to Villalobos, defendant said that his father died at about the time defendant was found guilty and that "with the consent of the attorney I left for the Fun[e]ral." He also told Villalobos he had made the mistake of remaining in Mexico until 2002.

¶ 32     Attached to the petition was defendant's affidavit, which alleged that in 2004 Domin failed to advise him he could seek a new sentencing hearing because he was sentenced *in absentia* (725 ILCS 5/115-4.1(e) (West 2004)). Defendant also attached what appears to be the title for a burial tomb for Gregorio Aguilar Valencia, dated June 24, 1991, three days after defendant was sentenced.[4] Defendant further provided character references from Mexican officials and correspondence with various individuals, including the aforementioned attorneys,

---

[3]We note that in 2006 Rascia's license was suspended for three months because he "neglected three criminal appeals and, while he was a partner at a law firm, failed to supervise a law firm associate in connection with those appeals."

[4]The document is written in Spanish, and defendant has not provided a translation at this stage.

the assistant public defender's office, the Illinois Attorney Registration and Disciplinary

Commission (ARDC), and the Consulate General of Mexico.

¶ 33    On April 18, 2016, the trial court entered an eight-page order dismissing the petition as

frivolous and patently without merit. The court acknowledged that the record did not indicate

whether an interpreter was present when defendant was found guilty. Yet that proceeding did not

implicate his substantial rights. He failed to demonstrate how the lack of an interpreter caused

the proceeding to be fundamentally unfair, given that he could not have assisted defense

counsel's legal arguments prior to the entry of the judgment. Additionally, the court found that

defendant "knowingly fled the country in order to avoid sentencing and the court did not violate

his constitutional rights by sentencing him *in absentia*." Furthermore, defendant's challenge to

the court's statutory admonishments that he could be sentenced *in absentia* did not raise a

constitutional issue cognizable under the Act.

¶ 34                                    II. Analysis

¶ 35    On appeal, defendant asserts the trial court erroneously dismissed his petition because he

was denied his constitutional right to be present. He also contends that the public defender

appointed to represent him in 2004 provided ineffective assistance.

¶ 36    "The Post-Conviction Hearing Act provides a criminal defendant the means to redress

substantial violations of his constitutional rights in his original trial or sentencing." *People v.*

*Allen*, 2015 IL 113135, ¶ 20. At the first stage of postconviction proceedings, the circuit court

must determine whether, taking the allegations as true, the petition is frivolous or patently

without merit. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). A petition is frivolous or patently

without merit where it lacks an arguable basis in law or fact. *Id.* at 11-12. "A petition which

lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless

legal theory or a fanciful factual allegation." *Id.* at 16. For example, a legal theory contradicted by the record is indisputably meritless. *Id.*

¶ 37    Conversely, first-stage dismissal is inappropriate where the petition alleges facts sufficient to state the gist of a constitutional claim, even if the petition lacks a formal legal argument or legal citation. *Allen*, 2015 IL 113135, ¶ 24. In evaluating a petition's allegations, the trial court must take them as true and liberally construe them in the defendant's favor. *Id.* ¶ 25. The threshold to survive summary dismissal is low. *People v. Parada*, 2020 IL App (1st) 161987, ¶ 16. We review summary dismissal of a postconviction petition *de novo*. *People v. Buffer*, 2019 IL 122327, ¶ 12.

¶ 38    "[B]oth the federal constitution and our state constitution afford criminal defendants the general right to be present, not only at trial, but at all critical stages of the proceedings, from arraignment to sentencing." *People v. Lindsey*, 201 Ill. 2d 45, 55 (2002). Generally, courts abhor trials *in absentia* due to their inherent unfairness. *People v. Coppage*, 187 Ill. App. 3d 436, 442 (1989).

¶ 39    The right granted by the federal constitution is implied from the due process clause of the fourteenth amendment. *Lindsey*, 201 Ill. 2d at 55. A defendant's presence is a condition of due process, however, only to the extent that a fair and just hearing would be thwarted by the defendant's absence. *People v. Bean*, 137 Ill. 2d 65, 83 (1990). The United States Supreme Court has never ruled "that the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow." *Snyder v. Massachusetts*, 291 U.S. 97, 106-07 (1934). Even when a proceeding constitutes a critical stage entitling a defendant to be present, "a defendant's absence is not a *per se* constitutional violation. Rather, a defendant's absence from such a proceeding will violate his constitutional rights only if the record demonstrates that

defendant's absence caused the proceeding to be unfair or if his absence resulted in a denial of an underlying substantial right." *Lindsey*, 201 Ill. 2d at 57. Courts must consider the entire record when determining whether the defendant's exclusion was just or unjust. *People v. Lofton*, 194 Ill. 2d 40, 67 (2000) (citing *Snyder*, 291 U.S. at 115).

¶ 40    We begin by finding that the trial court's pronouncement of guilt was arguably a critical stage of trial. Case law is sparse concerning a defendant's right to be present when the trial court finds him guilty. *People v. Smith*, 6 Ill. 2d 414 (1955) (finding that the defendant's absence from the trial court's pronouncement of guilt violated his right to be present but not addressing whether his presence would have been useful); but see *Bean*, 137 Ill. 2d at 80, 84 (citing *Smith* and recognizing that the United States Supreme Court had limited the situations in which a defendant's absence violates the constitution). That being said, cases have found that the rendering of the jury's verdict constitutes a critical stage. *People v. Nelson*, 18 Ill. 2d 313, 315, 319-20 (1960); *People v. Nettles*, 107 Ill. App. 2d 143, 151 (1969); see also *Bell v. Cone*, 535 U.S. 685, 695-96 (2002) (stating in the context of the sixth amendment right to counsel that a critical stage means "a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused"); *People v. Rainwater*, 207 Ill. App. 3d 1096, 1100 (1991) (stating in the context of the right to effective counsel that the return of the jury's verdict constitutes a critical stage of a criminal trial). At least one court has determined that the trial court's pronouncement of guilt at a bench trial similarly constitutes a critical stage of proceedings.

¶ 41    In *United States v. Canady*, 126 F.3d 352, 354 (2d Cir. 1997), the defendant asserted that the district court's failure to announce the finding of guilt in open court at the end of the bench trial violated his constitutional right to be present. The district court had mailed the decision to

the parties, and the defendant learned of his convictions when reading a newspaper two weeks later. *Id.* at 355. The court of appeals agreed that the district court violated the defendant's right to be present. *Id.* at 360-61. While the government argued that the defendant's presence at the district court's pronouncement of its decision would have been useless, the court of appeals disagreed. *Id.* at 361.

¶ 42     "There is a distinctly useful purpose in ensuring that the pronouncement of the defendant's guilt or innocence by the court is both face-to-face and public." *Id.* "It assures that the trial court is 'keenly alive to a sense of [its] responsibility and to the importance of [its] functions.' " *Id.* (quoting *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (finding the defendant's right to a public trial was violated)). Additionally, the court noted that, in the context of jury trials, several courts rejected the argument that a defendant's presence was useless, finding his presence has a psychological influence on the jury. *Id.* at 362 "We see no reason why a defendant's presence is less critical when the court, instead of the jury, renders its decision as to the ultimate issue of whether the defendant is guilty or innocent." *Id.* at 361-62.

¶ 43     Based on the foregoing case law, the trial court's pronouncement of defendant's guilt was arguably a critical stage of trial. Additionally, defendant's petition shows that he was arguably absent from that proceeding, notwithstanding his physical presence in the courtroom.

¶ 44     The right of a defendant to be present would ring hollow if a defendant who neither speaks nor understands English is not assisted by an interpreter. *People v. Raczkowski*, 359 Ill. App. 3d 494, 497 (2005). "The presence of an interpreter for a defendant who does not speak or understand English ensures that the defendant will not 'face the Kafkaesque spectre of an incomprehensible ritual which may terminate in punishment.' " *People v. Escalante*, 256 Ill. App. 3d 239, 246 (1994) (quoting *United States v. Carrion*, 488 F.2d 12, 14 (1st Cir. 1973)

(*per curiam*)). "Without the aid of an interpreter, [a defendant], though physically present in the courtroom, is not 'mentally' there, and, thus, he cannot participate in or understand the proceedings." *Raczkowski*, 359 Ill. App. 3d at 498.

¶ 45     According to the petition, no interpreter appeared when the trial court found defendant guilty. The record does not rebut this allegation. See also *Lofton*, 194 Ill. 2d at 66 (stating that an attorney has no power to waive a defendant's right to be present). Additionally, we are not persuaded by the State's assertion that the record shows defendant understood English. Defendant's willingness to proceed without an interpreter at largely inconsequential pretrial hearings is immaterial. Furthermore, Michelle's testimony that she spoke English with the men she encountered creates a factual dispute at best. Even if defendant spoke enough English to tell Michelle that the person she was looking for was not present, it does not follow that he could understand criminal proceedings held in English. Moreover, while the presentence investigation report indicates that, at some point, defendant understood he had been found guilty, that report does not show he understood what was happening as it happened. The sheriff's spontaneous commentary in 2004 is even less compelling, as the record does not show that he was qualified to determine whether defendant sufficiently spoke and understood English so as to be present at a legal proceeding. Furthermore, 13 years had passed since the trial court found defendant guilty, plenty of time in which he could have learned English.

¶ 46     We further find that defendant's presence was arguably not useless. *Id.* at 67 (stating that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure"). As stated in *Canady*, a defendant's presence may have a psychological impact on the trier of fact. Additionally, the variance between the indictment and the evidence produced at trial arguably

rendered it all the more important that defendant understand the basis for his conviction. Furthermore, Del Valle's pronouncement that he knew "who did this" and was willing to testify against that individual rendered this proceeding particularly unusual. The record does not show whether defendant was otherwise aware of Del Valle's assertion.[5] By being absent for the pronouncement of guilt, defendant would also have been absent when the trial court set the next court date and statutorily admonished him about the prospect of being sentenced *in absentia*. *Cf. People v. Smith*, 188 Ill. 2d 335, 341 (1999) (stating that "[a] defendant waives the right to be present when the defendant voluntarily absents himself or herself from trial"); *People v. Garner*, 147 Ill. 2d 467, 475 (1992) (stating that section 113-4(e) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, ¶ 113-4(e)) is designed to dissuade a defendant from absconding at any time before or after trial and to achieve a formal waiver of his right to be present). While the State correctly argues that the absence of statutory admonishments would not itself raise a constitutional claim, it would nonetheless have been useful for defendant to be present for those admonishments. *Cf. People v. Partee*, 125 Ill. 2d 24, 39 (1988) (recognizing that, "[a]s a matter of constitutional law, it is clear that a defendant who flees during trial may be tried and sentenced in his absence, even if he is not specifically informed that this is a possible consequence of his flight").[6]

¶ 47                                          III. Conclusion

---

[5]It is not entirely clear whether Del Valle was referring to the principal in the offense or a person who held down R.M.'s arms.

[6]We note that the State has not addressed how defendant waived the right to appear at the next court date if he was not effectively informed of that date. Taking as true defendant's allegation that Del Valle said he could go to Mexico to be present for his father's death, we also note that statutory admonishments might have led him to question Del Valle's advice.

¶ 48    Here, defendant's petition stated the gist of the constitutional claim that he was denied his constitutional right to be present at trial. Consequently, the trial court erred in summarily dismissing the petition, and we reverse and remand for further proceedings under the Act. Our determination renders it unnecessary to consider defendant's other claims at this juncture. *People v. White*, 2014 IL App (1st) 130007, ¶ 33 (noting that partial dismissals are not permitted under the Act).

¶ 49    For the foregoing reasons, we reverse the trial court's judgment and remand for further proceedings under the Act.

¶ 50    Reversed and remanded.

**No. 1-16-1643**

| | |
|---|---|
| **Cite as:** | *People v. Aguilar*, 2020 IL App (1st) 161643 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 89-CR-14118; the Hon. Alfredo Maldonado and the Hon. Earl E. Strayhorn, Judges, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Emily Hartman, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Veronica Calderon Malavia, Assistant State's Attorneys, of counsel), for the People. |