# Illinois Official Reports

## Appellate Court

---

**People v. Savage, 2020 IL App (1st) 173135**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAKEEN SAVAGE, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-17-3135 |
| Filed | September 30, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 92-CR-19827; the Hon. Dennis J. Porter, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Richard Connor Morley, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Matthew Connors, and Tyler J. Cox, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Hall and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant Jakeen Savage appeals from the first-stage dismissal of his *pro se* petition for postconviction relief.

¶ 2    After a bench trial, defendant, age 22, was convicted of first degree murder and attempted first degree murder and sentenced to a total of 85 years with the Illinois Department of Corrections (IDOC).

¶ 3    Defendant's *pro se* petition claims that his 85-year sentence violates the provision of the Illinois Constitution requiring penalties to have the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11 ("All penalties shall be determined *** with the objective of restoring the offender to useful citizenship."). Defendant alleges that the sentencing court failed to consider his drug addiction, particularly in conjunction with his young age.

¶ 4    For the following reasons, we reverse and remand for second-stage proceedings.

¶ 5                                  BACKGROUND
¶ 6                              I. *Pro Se* Petition
¶ 7    On September 15, 2017, defendant filed a *pro se* petition for postconviction relief, alleging that his 85-year sentence violated the provision of the Illinois Constitution requiring "penalties" to have "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Defendant alleged that he had been a drug addict since he was nine years old and "under the sway of adult gangbangers." At the time of the offense, he was "22 yrs. old with a mind soaked in drugs since childhood." Defendant alleges that his long-term addiction and his young age left him "more susceptible to peer pressure" and "more volatile in emotionally charged settings." Defendant claims that he could not have made these arguments prior to the decisions in *People v. House*, 2019 IL App (1st) 110580-B, *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020), and *People v. Harris*, 2018 IL 121932. Defendant argues that his sentence does not take into account whether he could be restored to useful citizenship, thereby violating the constitution as applied to him.

¶ 8    In his supporting affidavit, defendant avers that, in the instant offenses, he was "attempt[ing] to rob a drug house and got into a position of having to kill someone or be killed." Defendant avers that, at the time of the offense, he was "abusing drugs on a daily basis."

¶ 9    Defendant further avers that he has since "conquered [his] drug habit," that he has been tested many times in prison for drugs, and that, although drugs were readily available in prison in the past, he did not once test positive for them.

¶ 10                            II. Order Appealed From
¶ 11   The order entered by the trial court on October 27, 2017, dismissing defendant's petition, contains no description of either the evidence at trial or the sentencing hearing. Concerning the trial, the order states simply: "Petitioner's convictions stem from events occurring on August 12, 1992, when petitioner murdered Brian Keyes and attempted to murder Leon 'Tony' Reed. After a bench trial, he was found guilty. Petitioner appealed[.]"

¶ 12   The trial court dismissed defendant's claim under both the eighth amendment and the proportionate penalties clause on the ground that defendant was over 18 years old and "directly

responsible for the murder." The four-page order makes no mention of defendant's drug addiction.

¶ 13                                    III. The Trial

¶ 14        No issues are raised on this appeal concerning the evidence at trial or defendant's conviction of the underlying charges. Thus, we provide a summary of the facts below.

¶ 15        The State's evidence established that defendant shot two men, killing one, during a bungled attempt to rob the victims of drugs. During the evening of August 12, 1992, a group of people were sitting around a table and playing cards. The card-playing group included Brian Keyes, the murder victim; Leon Reed, the attempted murder victim; Sandra Hampton; and Lynn Cooper, who was also Keyes's mother and Reed's aunt. The table was located in the front room of an apartment shared by Reed and Ronald Allen, and where Keyes sometimes resided. Hampton lived in the apartment next door. Reed, Allen, Hampton, and Cooper all testified at trial.

¶ 16        At 9 p.m., Allen exited the apartment and entered the hallway of the apartment building where he encountered defendant and another man. The second man held Allen in the hallway, while defendant entered the apartment. Before the apartment door closed, Allen observed defendant pull a silver revolver out of the back of his pants, by his waist.

¶ 17        After defendant entered the apartment, defendant pointed the gun toward the ceiling, fired a shot, and announced that this was a robbery. Defendant pointed the gun at Keyes's head. Reed looked at Keyes, who was Reed's cousin, and Keyes looked back at Reed. Reed said "three" and lifted the table up, which he intended as a diversionary tactic and which he intended Keyes to join. Cooper fell backward in her chair, and Hampton headed for the floor. Reed, Cooper, and Hampton then heard one shot fired. Reed stood up, and defendant asked him, "Tony, where's the dope?" "Tony" was Reed's nickname. Defendant then shot Reed twice in the stomach.

¶ 18        The parties stipulated that, if called to testify, the medical examiner would testify that Keyes died from a single gunshot wound to the head.

¶ 19        After listening to the parties' closing arguments, the trial court found defendant guilty of the first degree murder of Keyes and the attempted first degree murder of Reed.

¶ 20                        IV. Evidence at Sentencing Hearing

¶ 21        Defendant's sentencing hearing was held on January 26, 1995. After finding that defendant was eligible for the death penalty, the trial court considered factors in aggravation and in mitigation.

¶ 22        The parties stipulated (1) that defendant pled guilty to criminal trespass to a vehicle on May 21, 1991, and received four months of court supervision, and (2) that, in May 1992, defendant was arrested for possession of cocaine, to which he pled guilty on August 7, 1992, and was sentenced to one year of probation by Justice Bertina Lampkin,[1] when she presided in criminal court. The parties further stipulated that he was on this probation when he was arrested for the instant offense.

---

[1]Although Justice Lampkin is a member of this division, her actions are wholly unrelated to this appeal, and she is not a member of this panel.

¶ 23    As its first witness in aggravation, the State called Assistant State's Attorney (ASA) Michael Rogers. Rogers identified a 14-page statement by defendant that had been recorded by a court stenographer on August 14, 1992, and that Rogers, defendant, and a detective had signed. The statement was recorded two days after the offense in question and described the offense. After the statement was admitted in evidence, the ASA read it into the record and thereby published it to the trial court.

¶ 24    In the statement, defendant said that on August 12, 1992, he formulated a plan "[t]o stick up the dope dealers," who were located in the apartment that was the scene of the offense. When he entered the hallway of the apartment building, he observed two women exiting the apartment who had just purchased drugs. Then a man exited the apartment, and defendant reached for his gun, but it was stuck in his back left pocket. As defendant was trying to reach for his gun, the man stepped back, away from the apartment, and the apartment door was open. Defendant pulled his gun out with his left hand and entered the apartment. Inside the apartment, defendant observed two men and two women playing cards. Defendant pointed his gun at the man who was sitting closest to defendant, with his back toward defendant, and defendant demanded money. This man jumped up and grabbed defendant's left wrist. The two men tussled, and the gun went off. When the gun went off, the gun was in defendant's left hand and the gun fired at the man's head. The other man "was already by" defendant, and defendant shot him too and fled. Defendant gained nothing from this intended robbery.

¶ 25    On August 15, 1992, defendant provided a second statement that was also recorded by a court stenographer and signed by defendant, the ASA, and a detective. This second statement concerned a robbery that defendant committed earlier, on May 27, 1992. After being admitted into evidence, this statement was also read into the record and thereby published to the trial court. Defendant stated that he went with a "bee-bee gun," to the same apartment building involved in the instant offense, with the intent of "[s]ticking up some dope peddlers." Defendant observed three men about to enter the apartment building, and he robbed them of a black jacket and $890, which he used shortly thereafter to purchase cocaine. After the purchase, he was arrested for a drug offense.

¶ 26    The State next called Detective Dennis Walsh, who testified that he searched the apartment shortly after the shooting in the instant offense and that he did not observe drugs or drug paraphernalia.

¶ 27    In mitigation, the defense called James Edwards, who was the superintendent of Division 1 of the Cook County Department of Corrections. Since defendant's arrival at Division 1 in August 1992, Edwards has received no disciplinary reports concerning defendant.

¶ 28    Defendant's mother, Mae Davis, testified that she and defendant's father were not living together when defendant was born and that the relationship ended when defendant was five years old. Davis lived with her mother until defendant was seven years old. When Davis began living with her husband, Davis moved next door to her mother. At some point, Davis moved from the neighborhood, and defendant, who was 9 or 10 years old, wanted to move back with Davis's mother, which he did. However, Davis moved again and insisted that defendant, who was then 11 or 12 years old, move back with her. A couple of years later, she noticed a change in his behavior, where he was not talking to her and "hanging around with the wrong boys." Davis was working as a legal secretary at a law firm, so she could not "be there all the time." At some point, she had him placed in a psychiatric hospital called Hartgrove Hospital, where he stayed for four months. They told her he had a behavioral problem and released him on

- 4 -

medication. Defendant "seemed better," and he enrolled in "job corps."[2] When defendant was 20 or 21 years old, he worked at a restaurant for six months, but he had asthma attacks that would force him to stop working. Since defendant has been incarcerated, she has visited him every other Saturday. She has observed a change in him, and he has become more religious.

¶ 29    When defendant addressed the court, he stated how sorry he was but that he was not "a killer," that he "didn't go in intentionally trying to hurt anyone," and that he had "a drug problem."

¶ 30                                V. Presentence Report

¶ 31    The presentence investigation report states that defendant had no juvenile adjudications and only one prior adult offense, for which he received probation. At age 13, he joined the Gangster Disciples and began abusing alcohol. Beginning at age 14, he used PCP twice a month and marijuana daily. By age 19, he was a heavy drinker and was using crack cocaine daily. Defendant claimed that he quit both drugs and the gang when he was incarcerated.

¶ 32    Defendant reported that his mother and stepfather had beat him with extension cords when he was "bad." Defendant left school in the tenth grade because of a "bad gang situation." After leaving school, he attended the Joliet Job Corps, in Joliet, Illinois, for three months in 1988 and the Dayton Job Corps in Dayton, Ohio, for eight months in 1989. After leaving the corps, he was employed by a plumbing business as an assistant plumber for five months in 1990 and by a restaurant as a dishwasher and bus boy for the remaining seven months of 1990. In 1991, he became the manger and maintenance man at a pub, where he worked for eight months. The presentence investigation report (PSI) also noted that defendant has asthma and has had numerous asthma attacks.

¶ 33    The PSI stated "defendant's Hartgrove Hospital records are attached."[3] The hospital discharge report,[4] dated January 19, 1986, states that defendant was diagnosed with dysthymic disorder[5] and conduct disorder. In the "presenting problems" section of the report, his mother is reported as stating that sometimes defendant became so angry that she was fearful that he would use force against her in the future. The mother also reported that defendant was in special education classes. Concerning his drug use, the report stated: "It is unclear how much drugs [defendant] consumes but apparently his behavior deteriorated about six years ago and it is possible that he started taking drugs at this time." Although it was unclear the quantity of drugs that defendant was consuming, it was indicated that he was consuming "a considerable

---

[2]The phrase "job corps" is explained below in paragraph 32.

[3]Although not actually attached to the copy of the PSI appearing in our appellate record, the following appear elsewhere in our record: (1) a release form indicating that Hartgrove Hospital provided its discharge report in connection with the preparation of the PSI and (2) the discharge report itself.

[4]The appellate record indicates that, prior to trial, the trial court ordered and received the results of a behavioral clinical exam, but the results of that exam are not in the record.

[5]According to the Mayo Clinic's website, dysthymia is also called persistent depressive disorder, and it is a continuous, long-term form of depression. *Persistent Depressive Disorder (Dysthymia)*, Mayo Clinic (Dec. 8, 2018), https://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/symptoms-causes/syc-20350929 [https://perma.cc/X3Q9-NZBP].

amount of drugs."

¶ 34                                    VI. Sentence

¶ 35     After hearing factors in aggravation and mitigation, the trial court stated that it was not going to impose the death penalty. The trial court found that defendant was not "beyond rehabilitation at this point." The trial court observed that "in mitigation" was the fact that "you have made apparently a good adjustment to living in an institution" and also "your young age is in mitigation." The trial court then sentenced defendant to 60 years for the murder, and 25 years for the attempted murder to run consecutively to the murder sentence.

¶ 36                                    VII. Appeal

¶ 37     On direct appeal, this court granted the public defender's motion for leave to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and affirmed the judgment of the trial court.

¶ 38     As we noted above, the trial court dismissed defendant's *pro se* petition at the first stage. A timely notice of appeal was filed, and this appeal followed.

¶ 39                                    ANALYSIS
¶ 40                          I. Post-Conviction Hearing Act
¶ 41     Defendant seeks relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)).

¶ 42     The Act provides a statutory remedy for criminal defendants who claim their constitutional rights were violated at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. It is not a substitute for an appeal but, rather, a collateral proceeding that attacks a final judgment. *Edwards*, 2012 IL 111711, ¶ 21.

¶ 43     The Act provides for three stages of review by the trial court. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the first stage, the trial court may summarily dismiss a petition only if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2014); *Domagala*, 2013 IL 113688, ¶ 32.

¶ 44     At the second stage, counsel is appointed if a defendant is indigent. 725 ILCS 5/122-4 (West 2014); *Domagala*, 2013 IL 113688, ¶ 33. After counsel determines whether to amend the petition, the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-5 (West 2012); *Domagala*, 2013 IL 113688, ¶ 33. At the second stage, the trial court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

¶ 45     If the defendant makes a "substantial showing" at the second stage, then the petition advances to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34. At a third-stage evidentiary hearing, the trial court acts as factfinder, determining witness credibility and the weight to be given particular testimony and evidence and resolving any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 46                                    II. Standard of Review

¶ 47        Defendant's petition was dismissed at the first stage.

¶ 48        "At the first stage of postconviction hearings there are no hearings, no arguments, and no introduction of evidence." *People v. Johnson*, 2018 IL 122227, ¶ 21. "Instead, there is only a pleading, the postconviction petition, that the circuit court must independently consider to determine whether it is frivolous or patently without merit." *Johnson*, 2018 IL 122227, ¶ 21.

¶ 49        "Where the issue on review is limited to the sufficiency of the allegations in a postconviction petition, there is little justification for affording deference to the circuit court's decision." *People v. Robinson*, 2020 IL 123849, ¶ 39. "Given that no factual findings or credibility determinations are required at the pleading stage of postconviction proceedings, a reviewing court is as capable as the circuit court of determining whether a petition and supporting documents contain adequate allegations." *Robinson*, 2020 IL 123849, ¶ 39. Thus, a reviewing court's standard of review is *de novo*. *Robinson*, 2020 IL 123849, ¶ 39. *De novo* consideration means that we perform the same analysis that a trial judge would perform. *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 107.

¶ 50                            III. Frivolous or Patently Without Merit

¶ 51        "To be summarily dismissed at the first stage as frivolous or patently without merit, the petition must have no arguable basis either in law or in fact, relying instead on 'an indisputably meritless legal theory or a fanciful factual allegation.' " *People v. Boykins*, 2017 IL 121365, ¶ 9 (quoting *People v. Hodges*, 234 Ill. 2d 1, 16 (2009)). "Meritless legal theories include those theories that are completely contradicted by the record." *Boykins*, 2017 IL 121365, ¶ 9. Fanciful factual allegations are those that are fantastic or delusional. *People v. Allen*, 2015 IL 113135, ¶ 25.

¶ 52        In evaluating the allegations in the petition, a court must presume them to be true and construe them liberally in the defendant's favor. *Allen*, 2015 IL 113135, ¶ 25; *People v. Aguilar*, 2020 IL App (1st) 161643, ¶ 37. The court is precluded from making any factual and credibility determinations. *Robinson*, 2020 IL 123849, ¶ 45.

¶ 53        First-stage dismissal is inappropriate where the petition alleges facts sufficient to state the gist of a constitutional claim, even if the petition lacks a formal legal argument or correct citations to authority. *Allen*, 2015 IL 113135, ¶ 24; *Aguilar*, 2020 IL App (1st) 161643, ¶ 37. There is a "low threshold" for surviving the first stage. *Allen*, 2015 IL 113135, ¶ 24; *Aguilar*, 2020 IL App (1st) 161643, ¶ 37. As a result, "our case law" reveals only "a limited number of reasons for summary dismissal of a postconviction petition." *Allen*, 2015 IL 113135, ¶ 25.

¶ 54                                    IV. Eighth Amendment

¶ 55        On appeal, defendant argues that his sentence is unconstitutional under the eighth amendment of the United States Constitution, as well as the proportionate penalties clause of the Illinois Constitution.

¶ 56        "The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). "That right," the United States Supreme Court has explained, " 'flows from the basic "precept of justice that punishment for crime should be graduated and proportioned" ' to both the offender and the

offense." *Miller*, 567 U.S. at 469 (quoting *Roper*, 543 U.S. at 560, quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). "The concept of proportionality is central to the Eighth Amendment." *Graham v. Florida*, 560 U.S. 48, 59 (2010). "And we view that concept less through a historical prism than according to ' "the evolving standards of decency that mark the progress of a maturing society." ' " *Miller*, 567 U.S. at 469 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976), quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion)).

¶ 57    In *Miller*, 567 U.S. at 465, the United States Supreme Court found that mandatory life without parole for offenders under 18 years old violated the eighth amendment. The Illinois Supreme Court has since found that the reasoning of "*Miller* applies to discretionary sentences" as well. *People v. Holman*, 2017 IL 120655, ¶ 40; *People v. Buffer*, 2019 IL 122327, ¶ 27 (*Miller* applies to juvenile life sentences, whether "mandatory or discretionary"). Our supreme court found that the key issue is not whether the sentence was mandatory or discretionary but whether a certain process was followed—namely, a sentencing hearing where youth and its attendant characteristics were considered. *Holman*, 2017 IL 120655, ¶¶ 37-38. Thus, life sentences for offenders under 18 years old, whether mandatory or discretionary, violate the eighth amendment if the trial court failed to specifically consider "some variant of the *Miller* factors." *Holman*, 2017 IL 120655, ¶¶ 40, 43-44.

¶ 58    Our supreme court has found that, before sentencing a juvenile to a life sentence, the trial court must consider the defendant's youth and its attendant characteristics, which include:

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

¶ 59    In the case at bar, defendant's 85-year sentence, if applied to a juvenile, would be considered a *de facto* life sentence. However, the 22-year-old defendant was well over 18 years old and, thus, not a juvenile offender. It is well established that offenders who are 18 years and older cannot raise a facial challenge to their sentences under the eighth amendment and the *Miller* line of cases. *Harris*, 2018 IL 121932, ¶¶ 59-61.

¶ 60    Although defendant was well past his eighteenth birthday at the time of his offense, he argues that his youth *in conjunction with* his drug addiction and other issues demonstrate that his sentence was inappropriate. In other words, the argument with respect to the eighth amendment is that his drug addiction and other issues at the time of the offense made him the functional equivalent of a juvenile and, thus, his sentence is unconstitutional as applied to him.

¶ 61    Although defendant raises an as-applied challenge rather than a facial challenge, Illinois courts typically consider the sentencing claims of young adults under the proportionate penalties clause rather than the eighth amendment. See, *e.g.*, *People v. Minniefield*, 2020 IL App (1st) 170541, ¶¶ 37-38 (considering a 19-year old defendant's as-applied sentencing claim under the proportionate penalties clause rather than the eighth amendment). This is because federal cases have generally drawn a line at 18 years of age (*Minniefield*, 2020 IL App (1st) 170541, ¶ 37) and because, as we explain below, the Illinois clause offers a broader path to the

same type of relief.

¶ 62                                    V. Illinois Constitution

¶ 63      Defendant's petition alleges that his 85-year sentence is unconstitutional as applied to him because it ignores his rehabilitative potential.

¶ 64      Like the eighth amendment, the proportionate penalties clause of the Illinois Constitution embodies our evolving standard of decency. See *People v. Miller*, 202 Ill. 2d 328, 339 (2002) ("as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community" underlying both the proportionate penalties clause and the eighth amendment). Specifically, the proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art I, § 11. This constitutional provision requires the balancing of the twin goals of retribution and rehabilitation, which requires a careful consideration of all the factors in aggravation and mitigation, including defendant's age and mental health. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 65      "The purpose of the proportionate penalties clause is to add a limitation on penalties beyond those provided by the eighth amendment and to add the objective of restoring the offender to useful citizenship." *Minniefield*, 2020 IL App (1st) 170541, ¶ 35. Thus, the proportionate penalties clause goes further than the eighth amendment in offering protection against oppressive penalties. *Minniefield*, 2020 IL App (1st) 170541, ¶ 35; see also *People v. Clemons*, 2012 IL 107821, ¶ 39; *People v. Fernandez*, 2014 IL App (1st) 120508, ¶ 63 ("the Illinois Constitution places greater restrictions on criminal sentencing than the eighth amendment's prohibition"). Unlike other constitutional provisions affecting criminal defendants,[6] these two provisions—the eighth amendment and the proportionate penalties clause—are *not* in lockstep. See *Minniefield*, 2020 IL App (1st) 170541, ¶ 35.

¶ 66                                    VI. Age and Addiction

¶ 67      As we explain below, Illinois law treats adults under 21 years of age differently than adults. Although defendant was seven months past his twenty-first birthday at the time of his offense, he argues that his then-lifelong drug addiction made him the functional equivalent of a younger man.

¶ 68      Recent and traditional legislative enactments support the view that "youthful offender[s]" are those under the age of 21. 730 ILCS 5/3-3-9(a)(1.5) (West 2018) (parole review for under 21-year-olds is called "youthful offender parole"). For example, last year, our legislature changed the law to make a person convicted of first degree murder eligible for parole after serving only 20 years, *if* he or she was under 21 years old at the time of the offense and was sentenced after the law took effect. Pub. Act 100-1182 (eff. June 1, 2019) (adding 730 ILCS 5/5-4.5-110); Pub. Act 101-288, § 5 (eff. Jan. 1, 2020) (amending 730 ILCS 5/5-4.5-110(b) and renumbering as 730 ILCS 5/5-4.5-115(b)). Urging passage of this bill, House Majority

---

[6]For example, with respect to the Illinois Constitution's due process and equal protection clauses, which are "nearly identical" to their federal counterparts, our supreme court has applied the limited-lockstep doctrine. *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 47 (explaining the limited lockstep doctrine).

Leader Barbara Flynn Currie argued that under-21-year-olds are "young people" who "do not always have good judgment." 100th Ill. Gen. Assem., House Proceedings, Nov. 28, 2018, at 48-49 (statements of Representative Currie). The Juvenile Court Act of 1987 defines a "[m]inor" as "a person under the age of 21 years subject to this Act" (705 ILCS 405/1-3(10), 5-105(10) (West 2018)), while an " '[a]dult means a person 21 years of age or older." (705 ILCS 405/1-3(2) (West 2018)).

¶ 69    Our state treats under-21-year-olds differently in other ways, such as prohibiting sales to them of alcohol (235 ILCS 5/6-16(a)(i) (West 2018)), cigarettes (720 ILCS 675/1 (West Supp. 2019)), and wagering tickets (230 ILCS 10/18(b)(1) (West 2018)); prohibiting their gun ownership without parental permission (430 ILCS 65/4(a)(2)(i) (West 2018)); and limiting Class X sentencing for recidivist offenders to those offenders "over the age of 21 years" (730 ILCS 5/5-4.5-95(b) (West 2018)). See also *People v. Mosley*, 2015 IL 115872, ¶ 36 (a ban on handgun possession by " 'minors' " under 21 does not violate the second amendment); 760 ILCS 20/2(1) (West 2018) (Illinois Uniform Transfers to Minors Act defines an adult as one "21 years of age" or older).

¶ 70    Although defendant was seven months past his twenty-first birthday at the time of the offense, his argument that mental health issues may lower a defendant's functional age finds support in recent case law. For example, this court found that the mental and emotional development of a nonjuvenile, but still youthful, defendant should be considered in assessing his culpability and fashioning an appropriate sentence. *House*, 2019 IL App (1st) 110580-B, ¶ 59; see also *People v. Ramos*, 353 Ill. App. 3d 133, 137 (2004) (sentencing court must consider a defendant's "mentality"); *Quintana*, 332 Ill. App. 3d at 109 (sentencing court must consider a defendant's "mentality"). Even for a mature adult, our law requires a sentencing court to consider whether, at the time of offense, the defendant was suffering from a mental disability that substantially affected his ability to conform his conduct to the requirements of the law. 730 ILCS 5/5-5-3.1(a)(16) (West 2018). In *Harris*, 2018 IL 121932, ¶ 48, the defendant had raised his as-applied constitutional challenge to his sentence on direct appeal, and our supreme court found that his claim was "more appropriately raised" in a postconviction petition, which is exactly what defendant seeks to do here. *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 97.

¶ 71    Defendant's argument also finds factual support in the filed record. His petition alleges that he had been a drug addict since he was nine years old, that he was using drugs every day at the time of the offense, and that he was attempting to rob a drug house when the offenses at issue occurred. His petition further alleges that his long-term addiction and his young age left him "more susceptible to peer pressure" and "more volatile in emotionally charged settings."

¶ 72    These allegations find support in the hospital discharge report that was filed in connection with the preparation of the PSI. The hospital discharge report was prepared when defendant was 15 and indicates that defendant began abusing drugs six years earlier, or when he was 9 years old. This corroborates defendant's allegation that he began using drugs when he was nine years old. The report states that defendant's behavior deteriorated remarkably at nine years of age, when the drug use began. The report indicates that, by the time he was 15 years old, defendant was consuming "a considerable amount of drugs," with the result that his mother was fearful of his potentially volatile behavior. Again, this corroborates defendant's allegation that his long-term addiction and young age left him "more susceptible to peer pressure" and

"more volatile in emotionally charged settings." The report also indicates that defendant was in special education classes and suffered from persistent depression and a conduct disorder.

¶ 73   Defendant's allegation of drug addiction also finds support in the record of the trial and sentencing. The State's witnesses testified at trial that, in the instant offense, defendant asked one of the victims, "Tony, where's the dope." This statement indicates that defendant knew "Tony" and that he fully expected "Tony" to have drugs. In defendant's recorded statements, he stated that his intent was to rob drug dealers and that, after a prior robbery, he used the money to purchase cocaine.

¶ 74   Although the sentencing court did briefly mention defendant's young age, the record in the case at bar did not show that the trial court considered the attributes of young adulthood or these attributes in light of defendant's lifelong drug addiction. We do not fault the sentencing judge. He could not have looked into a crystal ball in 1995 and have foreseen the statements concerning young adulthood that this court would later make and that defendant now cites. See, *e.g.*, *House*, 2019 IL App (1st) 110580-B, ¶ 55 (discussing the still-developing young adult brain).[7]

¶ 75   While both defendant's age and the hospital discharge report detailing his addiction were part of the PSI—and, thus, before the trial court at the time of sentencing—the trial court did not consider—and, really, could not have considered—defendant's age and addiction in light of the subsequent statements and findings made by later courts. Defendant's sentencing hearing was held on January 26, 1995, which was decades before most of the cases cited here were decided. For example, in *Buffer*, although the trial court stated that it had considered both the PSI and the defendant's age, our supreme court found that the record did not indicate that the trial court had considered youth and its attendant characteristics, as we now understand those concepts to mean. *Buffer*, 2019 IL 122327, ¶¶ 5, 46. Relying on *Buffer*, this court in *People v. Harvey*, 2019 IL App (1st) 153581, ¶ 13, specifically rejected an argument by the State that a trial court's consideration of a defendant's age and PSI decades ago sufficed to reject a *Miller*-type claim now.

¶ 76   We find that, where defendant's argument finds support in both the filed record and recent case law, it cannot be considered frivolous and patently without merit.

¶ 77   As a final note, this court's recent opinion in *People v. Rivera*, 2020 IL App (1st) 171430, is distinguishable from the case at bar. In *Rivera*, the defendant, who was six days short of his twenty-fourth birthday, sought leave to file a successive petition to challenge his 55-year sentence, and we affirmed the trial court's denial. *Rivera*, 2020 IL App (1st) 171430, ¶¶ 1, 24. The underlying offense involved the coordinated efforts of a number of gunmen, including defendant, who planned and staged a fake drug transaction. *Rivera*, 2020 IL App (1st) 171430, ¶ 5. The offenders offered to sell drugs to a group of purchasers and then robbed the group of their purchase money, shooting and killing one person in the process. *Rivera*, 2020 IL App (1st) 171430, ¶ 5. Defendant was convicted of first degree murder and five counts of armed robbery for a total sentence of 55 years. *Rivera*, 2020 IL App (1st) 171430, ¶ 1. In *Rivera*, we

---

[7]As this court has previously observed, we cannot fault a trial judge who "could not have looked into his crystal ball and predicted all the literature and court cases that had yet to be written about youthful offenders. Thus, there is no evidence in the record that he considered 'youth and its attendant characteristics' [citation], as we now understand those terms to mean ***." *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 92.

- 11 -

observed that defendant's actions exhibited "none of the immaturity or impetuosity that are the hallmarks of youth." *Rivera*, 2020 IL App (1st) 171430, ¶ 26. "Instead, the scheme in which he agreed to participate was a carefully planned and staged robbery—the coordinated effort of a number of offenders." *Rivera*, 2020 IL App (1st) 171430, ¶ 26.

¶ 78    By contrast, in the case at bar, defendant alleges, and the record provides support for his allegation, that he was a drug addict, looking to "Tony" for drugs. Unlike the case at bar, the *Rivera* defendant made no allegations in either his petition or in his appellate briefs that there were any issues particular to him, such as drug addiction or mental health, that rendered him functionally younger than his chronological age of 24 years. *Rivera*, 2020 IL App (1st) 171430, ¶ 23. Instead, the *Rivera* defendant relied on general statements in recent case law about the impetuosity of the young that were generically applicable to all young adults. See, *e.g.*, *House*, 2019 IL App (1st) 110580-B, ¶ 55 (observing that young adults are more susceptible to peer pressure and more volatile in emotionally charged settings). Thus, we find *Rivera* distinguishable.

CONCLUSION

¶ 79    For the foregoing reasons, the trial court's summary dismissal is reversed, and defendant's petition is remanded for second-stage postconviction proceedings.

¶ 80    Reversed and remanded.