2021 IL App (1st) 201108-U

FOURTH DIVISION
December 30, 2021

No. 1-20-1108

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 8011 |
| LUIS PADIN, | ) ) | |
| Defendant-Appellant. | ) ) | |
| | ) ) ) | Honorable James B. Linn, Judge Presiding. |

_____

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Rochford concurred in the judgment.

**ORDER**

¶ 1  *Held*:  Reversing the circuit court's first-stage dismissal of defendant's amended postconviction petition and remanding for second-stage proceedings where defendant stated the gist of a constitutional claim that his natural life sentence for an offense he committed at the age of 20 violated his rights under the proportionate penalties clause of the Illinois Constitution.

¶ 2  Defendant Luis Padin appeals the summary dismissal of his amended postconviction petition for relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.*

(West 2020)). The sole issue raised by defendant on appeal is that his petition states an arguable claim that his natural life sentence for offenses he committed at the age of 20, violates the proportionate penalties clause of the Illinois Constitution, requiring remand for second-stage proceedings under the Act. For the following reasons, we reverse the judgment of the circuit court and remand the matter for second-stage proceedings under the Act.

¶ 3                                    BACKGROUND

¶ 4      For the purposes of this order, we set forth only those facts necessary for the disposition of this case. Defendant was indicted by a grand jury on 51 counts of first-degree murder, four counts of attempted first-degree murder, and three counts of aggravated discharge of a firearm. The indictment alleged that on September 6, 2010, defendant fired multiple rounds from a handgun at a vehicle driven by Cristela Martha (Martha) in which Jennifer Alvarado (Alvarado) and Monica Calderon (Calderon) were passengers. Alvarado was struck and killed.

¶ 5      Prior to trial, the State elected to proceed on two counts of first-degree murder, predicated on defendant intentionally killing Alvarado or knowing that his actions created a strong probability of death or great bodily harm to her; one count of attempted first-degree murder of Calderon; and one count of attempted first-degree murder of Martha. Each elected count alleged defendant personally discharged a firearm during the commission of the offense.

¶ 6      The State filed a motion *in limine* prior to trial seeking to admit other-crimes evidence—proof that defendant was involved in another murder targeting members of the Latin Kings street gang—and evidence of defendant's membership in the Satan Disciples street gang, a neighboring rival of the Latin Kings.

¶ 7      The State premised its motion to admit other-crimes evidence on proof that defendant believed the occupants of the vehicle he targeted in the instant offense contained members of the

Latin Kings gang. The State further maintained the other-crimes evidence would demonstrate that on February 19, 2012, 18 months after the instant offense, defendant was driving a vehicle with several individuals near the border of Latin King and Satan Disciple territories. He flagged down a vehicle containing Latin Kings, and when the vehicle approached, one of the passengers in defendant's vehicle opened fire, killing the driver and injuring a passenger. The State asserted the other-crimes evidence was sufficiently similar to the instant offense because (1) in both instances defendant learned or believed the victims were Latin Kings, (2) both offenses involved shooting at suspected rival Latin Kings situated in vehicles, (3) the shootings occurred on the border of the gangs' territories, and (4) they occurred within 18 months of each other. The State sought to introduce the other-crimes evidence to demonstrate defendant's criminal intent, lack of an innocent frame of mind, *modus operandi*, and the presence of a common scheme or design.

¶ 8　　In response, defendant argued the crimes were not sufficiently similar where, during the other offense, he was the driver and was not aware his passenger would fire a handgun. He maintained that although he was the shooter in the instant offense, he was shooting in self-defense. He further maintained that the State would use the other-crimes evidence for the improper purpose of demonstrating his propensity to commit violent acts. After the matter was fully briefed and argued, the circuit court granted the State's motion, finding the other-crimes evidence was relevant for the purposes sought by the State and was additionally relevant to proving knowledge and absence of mistake.

¶ 9　　The State also sought to introduce evidence that defendant was a Satan Disciple in order to demonstrate his motive and common scheme or design. Defendant did not object, as the evidence supported his theory that he was defending himself from the Latin Kings who occupied the vehicle on which he opened fire. Accordingly, the circuit court granted the State's motion.

¶ 10    Defendant subsequently filed a motion to reconsider the admission of the other-crimes evidence, asserting that in light of the circuit court's ruling, he would no longer argue a theory of self-defense. Rather, his theory of defense was that the witnesses would not be able to identify him as the shooter. Defendant argued that since the identity of the shooter was the sole issue, the evidence of the subsequent murder was no longer relevant for the State to prove his intent, lack of an innocent frame of mind, *modus operandi*, or a common scheme or design in the instant offense. Defendant further maintained that he had no basis to object to the State admitting evidence of his gang membership, and acknowledged that such evidence was relevant to the State's theory regarding his motive. The circuit court denied defendant's motion, and the matter proceeded to trial.

¶ 11    The State's evidence at trial established that on September 6, 2010, Martha was driving to a concert in her red sedan with Alvarado in the front passenger seat and Calderon was seated in the backseat behind Martha. The women were driving southbound on Washtenaw Avenue when they observed several men on the corner of 24th Street and Washtenaw Avenue. As they turned onto 24th Street, one of the individuals on the corner inquired as to which gang the women were affiliated. The women responded that they were "a bunch of b***" because none of them were affiliated with a gang. They continued onto 24th Street and suddenly they heard several gunshots coming from behind their vehicle. They ducked, and through her driver's side mirror Martha observed a man in the middle of the street, approximately half of a block behind them, firing a handgun in their direction. Calderon did not observe the shooter. At the time of the shooting, the women were wearing jeans and blue or white shirts; none of them were wearing colors associated with a street gang.

¶ 12    When the shooting ceased, Alvarado stated that she had been shot. Martha proceeded to

the emergency room, where Alvarado died of her gunshot wound. Martha then drove to a police station, where she and Calderon viewed a photographic array. Martha identified defendant as the shooter, but Calderon was unable to make an identification. Martha also identified defendant as the shooter in a physical lineup in April 2013, and she identified him as the shooter in court.

¶ 13   Armando Matos (Matos) testified that immediately after the shooting defendant ran to his family residence near 23rd Street and Rockwell Street. Matos, who was living with defendant's family, opened the door and observed defendant holding a .40 caliber handgun, a firearm Matos had noticed previously in defendant's residence. Defendant indicated the police were on their way and he had to conceal the firearm, so Matos assisted defendant in hiding the handgun underneath the refrigerator. Defendant then proceeded to wash his hands with bleach and rub lotion on his hands to mask the odor from the bleach. Defendant requested that Matos assemble a video game in the living room so when the police arrived, it would give the impression that they were at home when the murder occurred.

¶ 14   Two Chicago police officers arrived at the residence shortly after defendant. They searched the residence but did not find the handgun. After the officers left, defendant removed the handgun and left the residence with the firearm. Defendant later related to Matos what had occurred that evening. According to Matos, defendant informed him that he was at an apartment building on 24th Street and Washtenaw Avenue with several individuals when they observed a red sedan occupied by male and female passengers. The passengers in the vehicle were shouting "SD killer" and "King love" as they drove past. Defendant believed the occupants of the vehicle were from a rival street gang. He was going to shoot at the sedan from the window of the apartment, but he noticed his sister outside near the vehicle and he decided to go outside instead. He and his companions ran outside when they observed the red sedan circling the block and

traveling back towards them. Someone waved the vehicle down, and defendant shot at it with the handgun. Teresa Montes confirmed at trial that defendant's sister was outside with her on the corner of 24th Street and Washtenaw Avenue during the shooting.

¶ 15    Testimony was also introduced regarding defendant's gang affiliation. Matos testified he and defendant were members of the Satan Disciples street gang, and at the time of the shooting, they both lived with defendant's family near 23rd Street and Rockwell Street, which was in Satan Disciple territory. Matos further testified there was a longstanding rivalry between the Satan Disciples and the Latin Kings. Moreover, the territories controlled by the two gangs shared a border at California Avenue. Matos identified several photographs of defendant's tattoos which represented his affiliation with the Satan Disciples.

¶ 16    The parties then stipulated that if called to testify, Aimee Stevens, an expert in the field of ballistic evidence examination, would testify she examined four discharged cartridge cases from the scene of the Alvarado murder. She would further testify that three of the four cartridge cases had contained .40 caliber bullets, and two of those three cartridge cases were fired from the same firearm; the third cartridge case was fired from a different firearm. Additionally, the fourth cartridge case had contained a nine millimeter bullet which could not have been fired from the same firearm as the first three bullets had been.

¶ 17    After the State rested, defendant moved for a directed verdict, which was denied. Defendant elected not to testify and did not present any additional evidence. Following closing arguments, the jury found defendant guilty of two counts of first-degree murder and two counts of attempted first-degree murder. The jury further found defendant had personally discharged a firearm during the commission of the offenses. The two first-degree murder charges were merged as they were predicated on defendant (1) intentionally killing Alvarado, and (2) knowing

that his actions created a strong probability of death or great bodily harm to her, respectively.

¶ 18    At the sentencing hearing, the State presented evidence in aggravation. Officer Kathy Schmidt of the Chicago police department testified that in May 2010, she was working undercover and purchased two bags of crack cocaine from defendant. Defendant was 19 years old at that time. The State further argued defendant had twice been convicted of gang loitering, once when he was 17, and once when he was 20. Defendant's presentence investigation (PSI) report additionally indicated he had been convicted for the unlawful possession of a handgun when he was 18, aggravated unlawful use of a weapon when he was 18, possession of cannabis when he was 20, and twice for reckless conduct, when he was 17 and 19. The State requested that the trial judge impose a sentence in excess of the 71-year minimum.

¶ 19    In mitigation, defendant argued he came from a broken home, had a religious upbringing, had not misbehaved in prison, and had successfully completed court supervision. He further argued the letters provided by his family members indicated he performed good deeds for them. After considering the factors in aggravation and mitigation, the circuit court found defendant had no rehabilitative potential and sentenced him to natural life imprisonment without the possibility of parole for first-degree murder involving his personal discharge of a firearm, and 30 years' imprisonment for each count of attempted murder to run concurrently with each other and consecutive to the natural life sentence. Defendant's motion to reconsider his sentence was denied.

¶ 20    Defendant appealed arguing that (1) the trial court erred in admitting other crimes evidence, (2) the trial court erred in admitting evidence of his gang affiliation, (3) he was denied effective assistance of counsel for failing to call an expert, and (4) his life sentence for murder was excessive in that the trial court failed to consider his youth and rehabilitative potential and

that it violated the United States and Illinois Constitutions. See *People v. Padin*, 2019 IL App (1st) 161672-U, ¶ 2. We affirmed defendant's conviction and sentence. *Id.* In regard to defendant's constitutional arguments, we held that (1) the eighth amendment did not apply to defendant's sentence as he was not a juvenile at the time of the offense and (2) his proportionate penalties clause challenge under the Illinois Constitution was premature because the record in the case was not sufficiently developed to allow us to review how the evolving science on juvenile maturity and brain development applied to defendant. *Id.* ¶¶ 79-80. We further found that the trial court did not abuse its discretion when it imposed a life sentence for murder. *Id.* ¶ 86.

¶ 21 On August 28, 2020, defendant filed an amended *pro se* postconviction petition under the Act raising several claims. Pertinent to this appeal, defendant's petition alleged that his discretionary life sentence violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution as he was 20 years old at the time of the shooting and his brain was not sufficiently developed. Specifically, defendant alleged that he commenced following street gangs before he was a teenager and that he joined a street gang at age 13. Shortly thereafter he dropped out of high school and the street gang became his only source of guidance as he grew up. Defendant asserted he had never known a life where street gang rules did not dominate his decision and that, as a result of his gang affiliation, he was exposed to an inordinate amount of violence. Attached to his petition were three research-based publications supporting his argument, including publications demonstrating that young adults naturally age out of criminal behavior in their 20s and that an adolescent's exposure to violence alters his or her brain development.

¶ 22 The circuit court summarily dismissed defendant's postconviction petition, stating in full:

"Luis Padin brings a *pro se* post-conviction petition, now an amended *pro se* petition. He is serving a life sentence, and he was suggesting that although he was the age of 20 at the time of the offense, that his life sentence was in violation of Miller versus Alabama and all of its progeny, including the Buffer case in Illinois.

The sentence in Mr. Padin's case, first of all, he was 20 at the time; second of all, this is not a mandatory life sentence, this is a discretionary life sentence, which after quite a bit of evidence in aggravation and matters in mitigation, such as they were, the Court imposed the life sentence discretionarily.

The Illinois appellate court just recently affirmed this case where this very issue was raised citing some of the same things that Mr. Padin raises in his *pro se* post-conviction petition. Accordingly, I find his *pro se* post-conviction petition is without merit. A life sentence, a discretionary life sentence for a 20-year-old is not unconstitutional."

This appeal followed.

¶ 23                                      ANALYSIS

¶ 24    On appeal, defendant requests we reverse the circuit court's order summarily dismissing his *pro se* postconviction petition. Defendant argues that his petition set forth an arguable basis for a claim that his natural life sentence plus two 30-year sentences to be served concurrently to each other and consecutively to the natural life sentence for a crime he committed when he was 20 years old was unconstitutional as applied to him, under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 25    The Act (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a framework for an incarcerated individual to collaterally attack his or her conviction by establishing the substantial

denial of a constitutional right in the trial or sentencing that resulted in that conviction. 725 ILCS 5/122-1(a)(1) (West 2020). Claims are limited to those that were not, and could not have been, previously litigated. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). Proceedings under the Act occur in three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). At the first stage, the circuit court determines, without input from the State, whether a petition is frivolous or patently without merit. *Id.*; 725 ILCS 5/122-2.1(a)(2) (West 2020). At the second stage, the court appoints counsel to represent the defendant and, if necessary, to file an amended petition; at this stage, the State must either move to dismiss or answer the petition. *Gaultney*, 174 Ill. 2d at 418; 725 ILCS 5/122-4, 122-5 (West 2020). Only if the petition and accompanying documentation make a substantial showing of a constitutional violation does the defendant then proceed to the third stage, an evidentiary hearing on the merits. *People v. Silagy*, 116 Ill. 2d 357, 365 (1987); 725 ILCS 5/122-6 (West 2020).

¶ 26    Defendant's petition was dismissed at the first stage. Our supreme court has made clear that, to survive first-stage scrutiny, a petition need only state the "gist" of a constitutional claim. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). Formal legal argument and citation of authority are not required (*id.*), and all well-pleaded facts that are not positively rebutted by the record must be taken as true (*People v. Romero*, 2015 IL App (1st) 140205, ¶ 26). A petition may be summarily dismissed as "frivolous or patently without merit" only when it has "no arguable basis either in law or in fact"—*i.e.*, where the petitioner's claim relies "on an indisputably meritless legal theory or a fanciful factual allegation." (Internal quotation marks omitted.) *People v. Boykins*, 2017 IL 121365, ¶ 9. We review the summary dismissal of a postconviction petition *de novo. People v. Brown*, 236 Ill. 2d 175, 184 (2010).

¶ 27                                    Eighth Amendment Claim

¶ 28      While defendant's main claim before us is that his sentence violates his rights under the proportionate penalties clause of the Illinois Constitution, his arguments do touch on whether his sentence also violates his rights under the eighth amendment.  Accordingly, we will briefly address the eighth amendment as it relates to defendant's claim.

¶ 29      The eighth amendment to the United States Constitution prohibits governments from imposing "cruel and unusual punishments."  U.S. Const., amend. VIII.  In a progression of cases involving the sentencing of juvenile offenders, the United States Supreme Court has held that the eighth amendment prohibits capital sentences for juveniles who commit murder (*Roper v. Simmons*, 543 U.S. 551, 578-79 (2005)), mandatory life sentences without the possibility of parole for juveniles who commit nonhomicide offenses (*Graham v. Florida*, 560 U.S. 48, 82 (2010)), and mandatory life sentences without the possibility of parole for juveniles who commit murder (*Miller v. Alabama*, 567 U.S. 460, 489 (2012)).  These cases reflect society's evolving recognition that "children are constitutionally different from adults for purposes of sentencing." *Id.* at 471.  First, juveniles generally "lack *** maturity and [have] an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking."  (Internal quotation marks omitted.)  *Id.*  Second, because of their "limited contro[l] over their own environment" and their general inability to remove themselves from crime-producing settings, juveniles "are more vulnerable *** to negative influences and outside pressures."  (Internal quotation marks omitted.)  *Id.*  Third, juveniles have characters that are not as "well-formed" as those of adults; their traits are "less fixed," and their "actions [are] less likely to be evidence of irretrievabl[e] depravit[y]."  (Internal quotation marks omitted.)  *Id.*

¶ 30      Following *Miller*, courts sentencing juveniles must consider "how children are different,

and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. In *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016), the Court held that this new substantive rule of constitutional law applies retroactively. Our own supreme court has gone even further, finding that *Miller* applies regardless of whether the life sentence imposed is actual or *de facto*, mandatory or discretionary. *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10; *People v. Holman*, 2017 IL 120655, ¶ 40.

¶ 31    These protections afforded by the eighth amendment, however, apply directly only to juveniles. As our supreme court has noted, the United States Supreme Court "has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." *People v. Harris*, 2018 IL 121932, ¶ 60. This cutoff was established "not based primarily on scientific research" (*id.*) but because the Court felt that "a line must be drawn" and "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood" (*Roper*, 543 U.S. at 574). As defendant was 20 years old at the time of his offenses, he failed to state the gist of a claim that his discretionary life sentence violated his rights under the eighth amendment.

¶ 32                    Proportionate Penalties Clause Claim

¶ 33    Defendant's main contention on appeal, however, is that the sentence imposed violated his rights under the proportionate penalties clause. The proportionate penalties clause of the Illinois Constitution specifically provides that "[a]ll penalties shall be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Our supreme court has explained that this emphasis on rehabilitative potential provides "a limitation on penalties beyond those afforded by the eighth amendment." *People v. Clemons*, 2012 IL 107821, ¶¶ 39-41. Our court, three times, has

specifically acknowledged that young adult offenders are "not necessarily foreclosed" from raising as-applied challenges to life sentences based on the evolving science on juvenile maturity and brain development under the proportionate penalties clause. See *People v. House*, 2021 IL 125124, ¶¶ 31-32; *Harris*, 2018 IL 121932, ¶¶ 46, 48; *People v. Thompson*, 2015 IL 118151, ¶ 44.

¶ 34    In *Thompson*, the court concluded that the as-applied, youth-based sentencing claim of an 18-year-old offender would be more appropriately raised in postconviction proceedings rather than on direct appeal due to the lack of a developed record. *Thompson*, 2015 IL 118151, ¶¶ 43-44. The court reached the same conclusion a few years later in *Harris*, when it was asked to consider the as-applied, youth-based sentencing claim of a defendant who was 19 years old at the time of his offense. *Harris*, 2018 IL 121932, ¶ 48. Most recently in *House*, the court reversed the trial court's second-stage dismissal of the 19-year-old defendant's postconviction petition and remanded the case for further second-stage proceedings under the Act in order to develop the record regarding the defendant's proportionate penalties claim. *House*, 2021 IL 125124, ¶ 32. Our supreme court has thus opened the door to the possibility that a young-adult offender might demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was "cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." *People v. Klepper*, 234 Ill. 2d 337, 348 (2009). However, in neither *Thompson*, *Harris*, nor *House*, did our supreme court outline the precise parameters of such a claim.

¶ 35    The State argues that summary dismissal of defendant's petition here was proper as the allegations in the petition were insufficient. The State observes that defendant recites the same

facts and circumstances that were presented to the trial court at his sentencing hearing—for example, his violence-filled adolescence, his age, his gang affiliation, and how he was raised. The State maintains that defendant's allegations make "general references to brain science in young adults, still without any nexus" between the research and defendant as required by *Harris*. See *Harris*, 2018 IL 121932, ¶ 46.

¶ 36    Unlike the case at bar, *Harris* involved a direct appeal—not a summary dismissal of a postconviction petition. *Id.* ¶ 17.  Accordingly, when the *Harris* court discussed the fact that the record there included "only basic information about defendant, primarily from the presentence investigation report" and noted that an evidentiary hearing had not been held, the court was viewing the record before it from a different procedural posture than we have in this case. *Id.* ¶ 46.  More applicable to the present matter, is our supreme court's recent decision in *House*. There, the court reviewed the second-stage dismissal of the defendant's postconviction petition and, finding the proportionate penalties claim worthy of consideration by the circuit court, remanded the matter for further second-stage proceedings. *House*, 2021 IL 125124, ¶ 32.  As recognized in *House*, the "fact finding" related to a postconviction claim does not occur at the first stage of postconviction proceedings.  Indeed, as our supreme court has long-recognized, this first stage merely requires the petitioner to set forth a "gist" of a constitutional claim consisting of "some facts which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent."  (Internal quotation marks omitted.)  *Hodges*, 234 Ill. 2d at 10.

¶ 37    Moreover, our supreme court has made clear that a defendant "need not set forth [a] claim in its entirety" and "need only present a limited amount of detail."  (Internal quotation marks omitted.)  *People v. Edwards*, 197 Ill. 2d 239, 244 (2001).  To require "full or complete

pleading" would be, the court has explained, "at odds with the 'gist' standard itself since, by definition, a 'gist' of a claim is something less than a completely pled or fully stated claim." *Id.* at 245. The justification for this lenient standard is that a *pro se* defendant will "in all likelihood be unaware of the precise legal basis for his claim or the legal elements of that claim." *Id.* The defendant may also "be unaware that certain facts, which in his mind are tangential or secondary, are, in fact, critical parts of a complete and valid constitutional claim." *Id.*

¶ 38    Here, defendant alleged in his postconviction petition that his violence-filled adolescence impacted his brain development and that his brain, at age 20, was not fully developed for him to appreciate the consequences and impact of his decisions. Defendant asserted that his brain bore more similarities to that of an adolescent under the age of 18 than to a fully mature adult. In support of his allegations, defendant averred that he "began following gangs before I even became a teenager" and "joined a gang when I was only 13 years old." According to defendant, he dropped out of high school and "[g]angs were all I have known and the streets were the only orientation and guidance I had growing up." Regarding the violence he experienced, he attested that "[a]s an adolescent I was exposed to a lot of violence and I could never see outside the violence all around me."

¶ 39    Defendant also appended three research-based publications to his amended petition: (1) Report of the Attorney General's Task Force on Children Exposed to Violence (Dec. 2012); (2) Developmental Neurobiology of Cognitive Control and Motivational Systems by Leah H. Somerville and BJ Casey, Sackler Institute for Developmental Psychobiology, Weill Cornell Medical College (Apr. 2011); and (3) Young Adults in Conflict with the Law: Opportunities for Diversion by Kanako Ishida, Policy Research Analyst, Juvenile Justice Initiative (Feb. 2015). These articles, in particular the Report of the Attorney General's Task Force on Children

- 15 -

Exposed to Violence, support defendant's allegation that the violence he was exposed to at a young age impacted his brain development. We find that defendant's allegations, when construed within the context of the amended petition as a whole including the appended publications, state the gist of a constitutional claim that warrants second-stage proceedings. See *People v. Zumot*, 2021 IL App (1st) 191743, ¶ 44 (reversing the summary dismissal of the 19-year-old defendant's proportionate penalties claim where he asserted the gist of a constitutional claim); *People v. Savage*, 2020 IL App (1st) 173135, ¶ 80 (reversing the summary dismissal of the 21-year-old defendant's proportionate penalties claim).

¶ 40    In reaching this conclusion, we find it fitting to address the State's argument that because defendant made a proportionate penalties claim in his direct appeal he is foreclosed from bringing such a claim in a postconviction petition. We observe that circuit courts may summarily dismiss postconviction petitions at the first stage where claims are *res judicata* or where such claims could have been adjudicated on direct appeal. *People v. Blair*, 215 Ill. 2d 427, 442-43 (2005). Exceptions to the doctrines of *res judicata* and forfeiture exist, however, which may allow an otherwise barred claim to proceed. *Id.* at 450. For example, these doctrines do not apply where fundamental fairness so requires or where facts relating to the claim do not appear on the face of the original appellate record. *Id.* at 450-51. In this instance, defendant raised a similar proportionate penalties claim before us in his direct appeal. As we noted, he did not have the benefit of bringing this claim before the trial court and making a factual record that is required for such constitutional claims. *Padin*, 2019 IL App (1st) 161672-U, ¶ 80. We did, however, provide defendant with the instruction that his proportionate penalties claim was better suited for a postconviction proceeding. *Id.* ¶ 79. At this juncture, to find defendant's claim barred by *res judicata* or forfeiture would be fundamentally unfair and would conflict with our

supreme court's suggestion that youth-based, as-applied proportionate penalties claims are "more appropriately raised" in postconviction proceedings than on direct appeal in a case such as this where the evidentiary record was not adequately developed to address the constitutional issue. See *Harris*, 2018 IL 121932, ¶ 48. Accordingly, we find that defendant's claim cannot be dismissed as *res judicata* at this first stage.

¶ 41    In sum, based on our review of the case law and defendant's petition, we conclude defendant has met the low bar of stating a gist of a constitutional claim in his postconviction petition. Thus, we find defendant's petition survives first-stage analysis and should move to second-stage proceedings.

¶ 42                                CONCLUSION

¶ 43    For the reasons set forth above, we reverse the circuit court's summary dismissal of defendant's *pro se* amended postconviction petition and remand this case for further proceedings under the Post-Conviction Hearing Act (725 ILCS 5/122-2.1(b) (West 2020)).

¶ 44    Reversed and remanded.