2023 IL App (1st) 1211405-U
No. 1-21-1405

FIRST DIVISION
June 5, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 07 CR 07355 |
| | ) | |
| PEDRO FUENTES, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Stanley Sacks, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Lavin concurred in the judgment.

**ORDER**

¶ 1  *Held:* We affirm denial of leave to file a successive postconviction petition where defendant did not establish cause for his claim that his sentence was unconstitutional based on his youth and background.

¶ 2  Defendant appeals the circuit court's denial of his motion for leave to file a successive postconviction petition filed under the Post-Conviction Hearing Act (Act), 725 ILCS 5/122-1 *et seq.* (West 2018), arguing that he established cause and prejudice for his claim that his *de facto*

56-year life sentence is unconstitutional because he was 22 years old at the time of the murder. For the following reasons, we affirm the trial court's order.

¶ 3                                   BACKGROUND

¶ 4       Following a jury trial, defendant was convicted of the 2007 first degree murder of Edgar Salvardor Cisneros (Edgar) and home invasion and sentenced to consecutive terms of 50 years' and 6 years' imprisonment. We affirmed on direct appeal. *People v. Fuentes*, 2013 IL App (1st) 092909-U. As we have provided detailed accounts of the facts in this prior order, we recount the facts here only as necessary to resolve the issue raised in the instant appeal.

¶ 5                                   **A. Trial**

¶ 6       The State proceeded to trial on the theory that defendant went to the apartment of his ex-girlfriend, Anabella Rojas (Anabella), uninvited and armed with a gun, and shot and killed her new boyfriend as a result of jealousy. At trial, Anabella testified that she and defendant had been in a relationship for several years and they had a son together. After their relationship ended in 2006, she moved into her own apartment in Chicago with their young son. Anabella and defendant remained in touch with each other, and she continued to drive one of defendant's car, a beige Grand Marquis, but she did not tell defendant where she was living. After their relationship ended, Anabella began a relationship with Edgar.

¶ 7       On the 5th or 6th of March 2007, defendant called Anabella and asked to borrow the car she was driving. She agreed and provided defendant with a key ring which contained a key to the car as well as keys to her apartment. Defendant borrowed the car again on March 9, 2007. They agreed that defendant would drop off the vehicle at Anabella's mother's house later that afternoon. When Anabella finished working sometime around 4:00 or 5:00 p.m., she arrived at her mother's house, but did not see the car. She called defendant several times, but his cell phone had been turned off.

Anabella returned to her apartment around 9:00 or 10:00 p.m., without her car, as she had plans with Edgar that evening. Edgar arrived at her apartment around 10:30 p.m., and they began watching television.

¶ 8        Later that evening, Edgar looked out her apartment window and told Anabella that her car was parked in front of the apartment building. Anabella told Edgar that he had to be mistaken because he never provided defendant with her new address. Shortly thereafter, Anabella heard footsteps on the stairs of her apartment building and then two or three knocks on her door. Before she could get to the door, defendant let himself into her apartment. At that point, Edgar was in the kitchen approximately 15 feet away from the front door. He threw a bottle at defendant, but it missed him.

¶ 9        Defendant asked Anabella if Edgar was the guy that she was "cheating on [him] with" and walked over to Edgar. The two men started "tussling" and punching each other. As the fight continued, they moved from the kitchen into the bedroom where Anabella and defendant's son was sleeping. Anabella followed the two of them, heard two gunshots, and saw Edgar drop to the ground. At that point, she saw defendant holding a gun. Defendant looked at her, told her "not to tell anybody" and ran out of her apartment. Anabella called 911 and the police arrived shortly thereafter. Anabella testified that she did not keep a gun at her house, she had never seen that gun before that night, and she had never seen Edgar pull out a gun. Prior to that evening, she had never seen defendant with a gun, but she had no doubt that defendant brought the gun to her apartment that night.

¶ 10       Cook County Assistant Medical Examiner Doctor Tera Jones performed the autopsy on Edgar. The autopsy revealed multiple signs of injury to his body, including gunshot wounds to his head, back, and right forearm. There were signs of soot and stippling around the entry wounds, indicating that the shot had been fired from a close distance. The doctor also observed signs of bruising on

Edgar's lower lip and an abrasion near his eyebrow. The doctor recovered three bullets from his body during the autopsy. The doctor concluded that he died from multiple gunshot wounds, and the manner of death was homicide.

¶ 11    At 1:30 a.m., defendant was arrested after Chicago Police Officer Ivan Lopez and his partner, Officer Robert Bell, observed him driving a beige colored four-door sedan southbound on Kedzie Avenue at "a high rate of speed." At that time, the officers were unaware that defendant was a suspect in a shooting. Defendant then made a left-hand turn onto 58th Street without using a turn signal and then pulled into an alley. When the officers approached the vehicle, defendant started getting out of the vehicle, but stopped when he saw the officers walking in his direction. Officer Lopez saw defendant make movements in the vehicle and, upon walking close to the vehicle, he saw defendant holding a handgun and attempting to hide it under the driver's seat. The officers ordered defendant out of the car, and they recovered a .22 caliber pistol underneath the driver's seat, which was subsequently inventoried. The gun was loaded with four rounds of ammunition. The officers transported defendant to the 8th District police station.

¶ 12    Officers Mark Harvey and Joseph Bebynista, both forensic investigators, processed the crime scene at Anabella's apartment. They observed some broken glass in the hallway and near the front door of the apartment. Blood was found in the bedroom along with two Remington .22 caliber cartridge casings that had been fired from an automatic weapon. The officers returned to the 8th District police station and performed a gunshot residue test on defendant's hands. The evidence that they collected was inventoried in accordance with police protocol.

¶ 13    Scott Rochowicz, a forensic scientist with the Illinois State Police, tested the gunshot residue test kit administered to defendant and found the results to be inconclusive. He explained that it is "pretty easy" for someone to remove gunshot residue from their hands and the lack of gunshot

residue did not mean that he or she did not fire a weapon. Moreover, he explained the Remington ammunition does not leave residue that can be detected by standard gunshot residue tests because it does not contain the type of metals that the standard test is designed to detect.

¶ 14     Brian Mayland, a forensic scientist with the Illinois State Police, concluded that the cartridge casings recovered from Anabella's apartment and the bullets removed from Edgar's body had been fired from the .22 Beretta recovered from defendant's car.

¶ 15     The defense presented the testimony of Laura Garcia, an interpreter employed by the Cook County Public Defender's Office, who read and translated a letter that had been written by Anabella to defendant during his pre-trial imprisonment. In that letter, she wrote that the police yelled at her, threatened to put her in jail and to take her son away from her, and she "had to make things up." She "remembered too late that he had the gun…" On cross-examination, Garcia testified that she did not know whether the letter was written entirely by Anabella or by someone else.

¶ 16     The parties stipulated that Assistant State's Attorney Gene Wood would testify that he spoke to Anabella on March 10, 2007, and she provided a handwritten statement in which she stated that she met Edgar in the summer of 2006 and began dating him seriously in November 2006.

¶ 17     During the jury instruction conference, the trial court granted defendant's request for the jury to receive instructions on second degree murder based upon imperfect self-defense and strong provocation. The jury found defendant guilty of first degree murder, home invasion and felony murder predicated on home invasion. The jury also found that defendant personally discharged a firearm that proximately caused Edgar's death.

¶ 18     The sentencing hearing was held on October 15, 2009. The trial court and the parties received the presentence investigation report (PSI), and neither party made any corrections or amendments

to it. The PSI showed that defendant's date of birth was December 25, 1984, and he grew up in Mexico with his parents and five siblings. In 1998, defendant and his younger brother came to the United States and lived with his paternal uncle in Chicago, and his parents arrived two years later. Defendant reported that he had a "good relationship with his parents and siblings…" He described his childhood as "normal with no physical, emotional, sexual or substance abuse present in the home." Prior to incarceration, he lived with his parents. He stated that he graduated from Farragut Career Academy High School in 2004, had "poor" grades, but was not in any special education classes. He told the investigator that he wanted to go to college and had been working to save money to pay for it. He reported that he had been working at a paper box factory since the summer of 2004 and earned $16.00 per hour.

¶ 19    As far as defendant's health history, he reported no health problems, his mental health was "good" and was not taking any prescribed medication. He denied previously using illegal drugs and not having a problem with alcohol. He also denied any gang memberships or affiliations.

¶ 20    During the sentencing hearing, the State read the victim impact statement from Edgar's aunt. In mitigation, defendant presented the testimony of his mother, Maria Fuentes. She testified that defendant was born in Mexico and came to the United States sometime before she and his father arrived in 2002. She saw defendant interact with his son and testified that "he loved his son very much…" At one point, defendant and Anabella lived together in the basement apartment with their son. She described her own relationship with defendant as "[e]xcellent" and her "children are really good people." She never saw any of her children act in a violent manner.

¶ 21    Defendant stated, in allocution, that he "fe[lt] sorry for the family" and the shooting was "an accident… [He] never wanted it to happen." He stated that he came to the United States when he was 11 years old and he "came here to study….because that's what I wanted to do for my family."

He further stated that he started working approximately three years ago. He described himself as not someone "who goes around looking for trouble with any other people."

¶ 22    Defense counsel argued, in mitigation, that defendant was "not in a gang…he's not involved in any gang activity. He has no drug or alcohol problem…" He pointed out that defendant was "employed, he was making 16 dollars an hour." He informed the trial court that defendant was currently 25 years old and asked the trial court to sentence defendant to the statutory minimum.

¶ 23    The trial court, in recalling the evidence, stated that defendant shot Edgar because he was jealous that his ex-girlfriend was with him, that "[h]e didn't like the thought she was with some other man with his baby", that "[h]e went to the house uninvited", and the "whole thing could have been avoided." The trial court acknowledged that, in reading the pre-sentence investigation report, defendant did not have anything "really bad" in his background, and he came from "[a] good family…" The trial court sentenced defendant to consecutive sentences of 25 years' imprisonment for first degree murder, 25 years' imprisonment for personally discharging a firearm that proximately caused the victim's death, and 6 years' imprisonment for home invasion.

¶ 24                                         **B. Direct Appeal**

¶ 25    Defendant challenged his conviction on direct appeal, arguing that: (1) the sufficiency of the evidence of first degree murder and argued that his conviction should be reduced to second degree murder; (2) trial court error in ordering the jury to continue deliberating when it returned with a partial verdict, solely finding him guilty of home invasion and felony murder; and (3) trial court error in refusing to send an exhibit back to the jury room during deliberations. On June 28, 2013, we affirmed defendant's conviction. *People v. Fuentes*, 2013 IL App (1st) 092909-U.

¶ 26                                 **C. Prior Postconviction Petitions**

¶ 27    On November 3, 2014, defendant filed his first *pro se* postconviction petition. In his petition, he argued: (1) the police unlawfully searched his car and did not provide *Miranda* warnings to him; (2) the police coerced him into implicating himself; (3) the police unlawfully searched Anabella's apartment and she was not provided with an attorney during questioning; (4) the State engaged in malicious prosecution because the victim had shot himself with his own gun during mutual combat; (5) the trial court erred in directing the jury to continue its deliberations; and (6) his sentence was unconstitutional where the trial court improperly considered, as aggravation, his contemporaneous conviction for felony murder as a prior conviction. The circuit court summarily dismissed defendant's petition. On March 15, 2017, appellate counsel's motion for leave to withdraw was granted and we affirmed the summary dismissal of this petition.

¶ 28    On April 19, 2017, defendant filed a motion for leave to file a successive postconviction petition. In this motion, defendant argued that the circuit court erred when it found the allegations in his initial petition were incomprehensible and reasserted the same allegations from this initial petition. He also alleged that his trial and appellate counsels were ineffective. On May 18, 2017, the circuit court denied defendant leave to file a successive postconviction petition. Defendant did not appeal the circuit court's decision.

¶ 29    On March 7, 2018, defendant filed a second motion for leave to file a successive postconviction petition. Defendant reasserted four of the six claims that he raised in his initial petition. On September 4, 2018, the circuit court denied defendant leave to file a second successive postconviction petition. Defendant appealed this decision and on September 22, 2020, we granted appellate counsel's motion to withdraw and affirmed the circuit court's denial of leave to file a second successive petition.

¶ 30                                **D. Current Postconviction Petition**

¶ 31    On July 7, 2021, defendant filed a *pro se* request for leave to file his third postconviction petition. In this petition, defendant raised a single claim that his *de facto* life sentence was unconstitutional under the Illinois Constitution's proportionate penalties clause as applied to him as an emerging adult because the circuit court did not consider his youth or rehabilitative potential. He alleged that he could not have raised this claim previously because the law and the science supporting the law had not been sufficiently developed at that time. He also argued that he was 23 years old at the time of the offenses with a brain similar to a juvenile offender, possessed rehabilitative potential, experienced a traumatic childhood, and should be allowed to file a successive petition so he could develop the record supporting his argument.[1]

¶ 32    He contended that he established the "cause" element where this claim was previously unavailable to him on direct appeal because it turned on the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), and the Illinois Supreme and Appellate Courts' decisions in *People v. Buffer*, 2019 IL 122327, *People v. House*, 2019 IL App (1st) 110580-B, *People v. Ruiz*, 2020 IL App (1st) 163143, and *People v. Johnson*, 2020 IL App (1st) 171362. And, citing to *People v. Thompson*, 2015 IL 118151, and *People v. Harris*, 2018 IL 121932, he argued that the Illinois Supreme Court also "opened the door for a young-adult offender" who had been sentenced to a life sentence to rely on the evolving neuroscience and societal standards underlying the rule in *Miller*.

¶ 33    Defendant also alleged in his petition that he came to the United States at the age of 13 and thereafter struggled in elementary and high school due to his lack of proficiency in the English language. He alleged that other students teased and bullied him. At school, he was "forced to adopt

---

[1] Defendant incorrectly alleged in this postconviction petition that he was 23 years old at the time of the offense, however, his date of birth is December 25, 1984, and the offense was committed on March 9, 2007. Consequently, he was 22 years and two months at the time of the offense.

to a problematic schools [*sic*] setting dealing with fights, shootings, beatings, stabbings, drugs and liquor." In his neighborhood, he was exposed to "gangs, drugs, and prostitution" and "threatened by gangs/drug-dealers to join, use drugs, and have group sex with prostitutes." At home, he saw family members using drugs and alcohol and "being extremely abusive…" As a teenager, he attended many funerals for other teens who had died because of street violence, suicide and drug overdoses.

¶ 34    To his petition, he attached a report entitled "Report to the 2017 Illinois PTA Convention on Young Adults Involved in the Justice System." This report focused on the brain development and maturity of young adults between the ages of 18 and 25 and the treatment for offenders in this age range within the criminal justice system. In addition to attaching certificates of achievements that he received while incarcerated, defendant also attached a letter dated June 2, 2021, indicating that defendant's request for medical records from Menard Correctional Center could not be fulfilled due to a lack of specificity.

¶ 35    On September 9, 2021, the circuit court denied defendant leave to file a third successive postconviction petition in a written order. After outlining some of the relevant caselaw pertaining to the *Miller* line of authority, the circuit court then found that, in *Harris*, 2018 IL 121932, our Supreme Court indicated that a defendant may raise an as-applied challenge "pursuant to the Proportionate Penalties Clause if the defendant could demonstrate that the 'evolving science on juvenile maturity and brain development highlighted in *Miller'* applied to the fact of his case." The circuit court found that "the First District has generally held that 'individuals who are 21 years or older when they commit an offense are adults for purposes of a *Miller* claim.'" *People v. Humphrey*, 2020 IL App (1st) 172837, ¶ 33; *People v. Minniefield*, 2020 IL App (1st) 170541, ¶¶ 37-45; and *People v. Rivera*, 2020 IL App (1st) 171430, ¶¶ 25-27. However, the circuit court

recognized that the First District made an exception in *People v. Savage*, 2020 IL App (1st) 173135, ¶¶ 69-76, for a defendant who was several months past his 21st birthday but who argued that his mental health issues and long history of drug abuse lowered his effective age. Looking at the allegations raised by defendant in his petition and defendant's age at the time of the offense, the circuit court found that "none of them come close to the exceptional facts of the defendant in *Savage*." Thus, upon finding that defendant was an adult at the time of the offense and unable to claim proportionate penalty protection under *Miller* or *Harris*, the circuit court denied defendant leave to file his third successive postconviction petition

¶ 36                                                ANALYSIS

¶ 37        At issue, here, is the circuit court's denial of defendant's motion for leave to file a successive postconviction petition under the Illinois Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). The Act provides a statutory mechanism for a criminal defendant to assert that there was a substantial denial of his or her rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 5/122-1(a)(1) (West 2018). The Act contemplates the filing of only one petition. *People v. Lusby*, 2020 IL 124046, ¶ 27; 725 ILCS 5/122-3 (West 2018) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived.") As a result, a defendant faces "immense procedural default hurdles when bringing a successive postconviction petition." *People v. Davis*, 2014 IL 115595, ¶ 14. These hurdles are lowered only in very limited circumstances so as not to impede the finality of criminal litigation. *Id.*

¶ 38        Prior to filing a successive postconviction petition, a petitioner must obtain leave of the circuit court. *Robinson*, 2020 IL 123849, ¶ 43. To obtain leave of court a defendant must demonstrate "cause" for the failure to raise the claim in the initial petition and that "prejudice" resulted from

that failure. *Lusby*, 2020 IL 124046, ¶ 27; see also 725 ILCS 5/122-1(f) (West 2018). Alternatively, the second basis to relax that bar against a successive postconviction petition is "what is known as the 'fundamental miscarriage of justice' exception." *People v. Edwards*, 2012 IL 111711, ¶ 22. We review the trial court's decision to deny leave to file a successive petition *de novo*, accepting all well-pled facts and attached affidavits as true. *Edwards*, 2012 IL 111711, ¶ 25.

¶ 39 Here, in defendant's third successive postconviction petition, he challenges his 56-year discretionary sentence as unconstitutional under the Illinois Constitution because the trial court failed to consider his age (22 years old) at the time of the shooting, when sentencing him. Because defendant raised this claim in a successive postconviction petition, defendant must satisfy the cause-and-prejudice test. The Act defines "cause" as "an objective factor that impeded [the defendant's] ability to raise a specific claim during his or her initial post-conviction proceedings." 725 ILCS 5/122-1(f) (West 2018). "Prejudice" involves the "demonstrat[ion] that the claim not raised during [the defendant's] initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." *Id*. The cause-and-prejudice test establishes a more onerous standard than that at the first-stage pleading stage. *People v. Smith*, 2014 IL 115946, ¶ 35. Leave to file a successive petition should be denied where (i) the petitioner's claims "fail as a matter of law" or (ii) the petition and accompanying documents are "insufficient to justify further proceedings." *Id*.

¶ 40 Defendant's sentencing challenge is based upon *Miller v. Alabama*, 567 U.S. 460 (2012), in which the United States Supreme Court held that the prohibition on cruel or unusual punishment in the eighth amendment of the United States Constitution (U.S. Const., amend VIII) forbids mandatory life sentences without the possibility of parole for "those under the age of 18 at the time of their crimes." *Miller*, 567 U.S. at 465, 479. Our supreme court has subsequently held that, where

an offender is younger than 18 years old, the trial court must consider certain factors before imposing a life sentence, including: his age and evidence of his "particular immaturity"; his family and home environment; his degree of participation in the homicide and any familiar or peer pressure; his incompetence; and his rehabilitative potential. *People v. Savage*, 2020 IL App (1st) 173135, ¶ 58 (citing *People v. Holman*, 2017 IL 120655, ¶ 46). *Miller* applies retroactively to cases on collateral review. *Montgomery v. Louisiana*, 577 U.S. 190, 206 (2016).

¶ 41    After the decision in *Miller*, the Illinois Supreme Court has concluded that *Miller* applied to *de facto* life sentences. *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10. In *People v. Buffer*, 2019 IL 122327, our supreme court defined a *de facto* life sentence for a juvenile as a sentence of more than 40 years' imprisonment. *Id*. ¶ 41. Here, the parties do not dispute that defendant's 56-year sentence constituted a *de facto* life sentence.

¶ 42    Defendant exclusively raises this claim as a violation of Illinois' proportionate penalties clause as "Illinois courts typically consider the sentencing claims of young adults under the proportionate penalties clause rather than the eighth amendment." *People v. Savage*, 2020 IL App (1st) 173135, ¶ 61 (citing *People v. Minniefield*, 2020 IL App (1st) 170541, ¶¶ 37-38). This is because federal cases have generally drawn a line at 18 years of age and because the Illinois clause offers a broader path to the same type of relief. *Savage*, 2020 IL App (1st) 173135, ¶ 61.

¶ 43    The proportionate penalties clause of the Illinois Constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the defendant to useful citizenship." Ill. Const. 1970, art. I, § 11. Our supreme court has held that the "limitation on penalties" in this clause "goes beyond the framers' understanding of the eighth amendment and is not synonymous with that provision." *People v. Clemons*, 2012 IL 107821, ¶ 40. For a defendant to succeed in a proportionate penalty claim, he must first demonstrate that the

penalty is degrading, cruel or "so wholly disproportionate to the offense that it shocks the moral sense of the community." *People v. Klepper*, 234 Ill.2d 337, 348-49 (2009).

¶ 44     The Illinois Supreme Court has, on two occasions, indicated that young adult offenders may establish an unconstitutional life sentence through a postconviction petition. In *People v. Thompson*, our supreme court rejected the 19-year-old defendant's as-applied constitutional challenge because it was raised for the first time on appeal. *People v. Thompson*, 2015 IL 118151, ¶ 44. However, the court noted that the defendant was not prohibited from raising the issue through the Post-Conviction Hearing Act. *Id.*

¶ 45      Subsequently, in *People v. Harris*, our supreme court reversed the appellate court's decision because the "appellate court held [the] defendant's sentence violated the Illinois Constitution without a developed evidentiary record on the as-applied constitutional challenge." *People v. Harris*, 2018 IL 121932, ¶ 40. The supreme court found that, because *Miller* did not apply directly to the 18-year-old defendant's circumstances, the record must be sufficiently developed to support the defendant's as-applied challenge. *Id*. ¶ 45.

¶ 46      Consequently, the import of these two decisions has been described as permitting "young adult offenders" to bring a postconviction claim "alleging that their sentences in excess of 40 years imposed without consideration of the *Miller* factors are unconstitutional as applied to them under the proportionate penalties clause." *People v. Horshaw*, 2021 IL App (1st) 182047, ¶ 69. However, for a young adult's proportionate penalties claim to be successful, the defendant must provide a factual showing that "the science concerning juvenile maturity and brain development applies equally" to a young adult's case. See *People v. House*, 2021 IL 125124, ¶ 29.

¶ 47     With this background, we initially address the issue of whether defendant established "cause" for his failure to raise this issue during his initial postconviction proceedings. Defendant alleges

that he could not have challenged the constitutionality of his sentence prior to this successive petition as the decisions in *People v. Harris*, 2018 IL 121932; *People v. Buffer*, 2019 IL 122327; and *People v. House*, 2021 IL 125124, had not been decided prior to him requesting leave to file this successive petition. He points to the fact that his current petition was filed on March 7, 2018, prior to any of these cases being decided. In response, the State argues that defendant cannot establish cause because all the cases defendant relies upon were based upon *Miller*, which was decided in 2012 and two years prior to defendant's initial postconviction petition.

¶ 48      We recognize that our supreme court has held that, under the proportionate penalties clause, young adults may rely on the evolving neuroscience and societal standard underlying the rule in *Miller* to support an as-applied challenge to a life sentence. See *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (19-year-old defendant "is not necessarily foreclosed from renewing his as-applied challenge in the circuit court" pursuant to the Act); *Harris*, 2018 IL 121932, ¶¶ 59-61. Recently, in *House*, 2021 IL 125124, ¶¶ 29-31, our supreme court once again found that a young adult may bring an as-applied challenge under the proportionate penalties clause based on a developed evidentiary record as to how the "science concerning juvenile maturity and brain development applies equally to young adults, or to petitioner specifically."

¶ 49      However, "while our supreme court has suggested that emerging adults may be able to leverage *Miller* to challenge their sentences under the proportionate penalties clause, that suggestion is not tantamount to a substantial change in the law that would provide the defendant cause to file a successive petition under the Act." *People v. Walker*, 2022 IL App (1st) 201151, ¶ 28 (court found that a 20-year-old defendant was unable to establish "cause" as an emerging adult). Specifically, in *People v. Dorsey*, 2021 IL 123010, our supreme court considered whether a 14-year-old defendant could establish the "cause" element for his proportionate penalties clause claim. Our

supreme court held that "*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause." *Id*. ¶ 74. The court found that "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing." *Id*. The court went on to find that "*Miller*'s unavailability prior to 2012 at best deprived defendant of 'some helpful support' for his state constitutional law claim, which is insufficient to establish 'cause.'" *Id*. (quoting *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59).

¶ 50        Since *Dorsey*, this court has "universally applied the holding in *Dorsey* to conclude that cause has not been established based on the prior unavailability of *Miller* and its progeny." *People v. Walsh*, 2022 IL App (1st) 210786, ¶ 33 (18-year-old defendant)(citing *People v. Figueroa*, 2022 IL App (1st) 172390-B, ¶¶ 36, 39; *People v. Ruddock*, 2022 IL App (1st) 173023, ¶ 72 (16-year-old defendant); *People v. Hemphill*, 2022 IL App (1st) 201112, ¶ 31 (21-year-old defendant); see also *People v. Walker*, 2022 IL App (1st) 201151, ¶¶ 28-29 (20-year-old defendant); *People v. French*, 2022 IL App (1st) 220122, ¶¶ 27-28 (20-year-old defendant); *People v. Wimberly*, 2022 IL App (1st) 211464, ¶ 9 (20-year-old defendant); *People v. Peacock*, 2022 IL App (1st) 170308-B ¶ 20 (17-year-old defendant); and *People v. Jones*, 2022 IL App (1st) 200569-U, ¶ 43 (20-year-old defendant). More recently, our supreme court reaffirmed its analysis in *Dorsey* and found that "[o]ur analysis of 'cause' in *Dorsey* applies equally to defendant's request for leave to renew his proportionate penalties clause challenge with respect to his intellectual disabilities." *People v. Clark*, 2023 IL 127273, ¶ 62.

¶ 51        Prior to *Clark*, however, the dissent in *People v. Mobley*, 2022 IL App (1st) 201255-U, criticized *Dorsey* on the basis that "[s]ome constitutional claims – like *Miller* claims and cases expanding on it – are so novel that their legal bases are not reasonably available until a court makes

them so." *Id.* ¶ 68 (dissent, Justice Hyman). Consequently, the dissent found that the defendant made a *prima facie* showing of cause to challenge his *de facto* life sentence. *Id.* We recognize that, in *Mobley*, the dissent looked at when the defendant filed his initial postconviction petition in 1998, he "could not have anticipated the line of cases expanding the holding of *Miller." Id.* ¶ 61. Here, the initial postconviction petition was filed much more recently, in 2014; two years after *Miller* was decided, which more closely aligns with the holding in *Dorsey.*

¶ 52    Defendant filed a motion to cite additional authority, in which he cited to *People v. Meneses*, 2022 IL App (1st) 191247-B, in support of his argument that he was able to establish the "cause" element. In *Meneses*, the defendant was 16 years old and had been convicted of first degree murder and attempt murder and sentenced to 60 years' imprisonment with eligibility for a day-to-day sentencing credit; thus, his sentence was not a *de facto* life sentence. *Meneses*, 2022 IL App (1st) 191247-B, ¶¶ 1-5.  We find that *Meneses* does not provide any support for defendant's claim. In sharp contrast to the facts here, in *Meneses*, the State did not dispute that the defendant satisfied the "cause" prong for leave to file. *Id.* ¶ 4.

¶ 53    In his reply brief, defendant attempted to distinguish *Dorsey* on the basis that the defendant in *Dorsey* was a juvenile at the time of the offense, and defendant was 22 years old at the time that he committed the offense in this case. However, in *People v. Hemphill*, 2022 IL App (1st) 201112, ¶ 31, following *Dorsey*, we already determined that a 21-year-old defendant could not satisfy the cause prong of the cause-and-prejudice test for bringing a successive postconviction petition with respect to a proportionate penalties' claim. More recently, in *Clark*, our supreme court followed its decision in *Dorsey*, finding that the defendant could not establish cause with respect to his proportionate penalties clause challenge as to his intellectual disabilities, and the defendant in *Clark* was 24 years old at the time that he committed the offense. *Clark*, 2023 IL 127273, ¶¶ 1, 62.

¶ 54    Likewise, in *People v. Moore*, 2023 IL 126461, ¶¶ 40-41, our supreme court found that the defendants, who were 19 and 20 years old, could not establish the cause element for their claims. The supreme court found that, "'*Miller's* announcement of a new substantive rule under the eighth amendment does not provide cause for a [juvenile offender' to raise a claim under the proportionate penalties clause.'" *Id*. ¶¶ 40-41; (quoting *Clark*, 2023 IL 127273, ¶ 61; quoting *Dorsey*, 2021 IL 123010, ¶ 74). Further, our supreme court found that, because *Miller* did not directly apply to young adults, "it also does not provide cause for a young adult offender to raise a claim under the proportionate penalties clause." *Id*. ¶ 40.

¶ 55     Consequently, based upon the clear holding in *Dorsey*, *Clark*, and *Moore*, defendant cannot establish cause for his failure to raise his proportionate penalties claim in his successive postconviction petition. See *French*, 2022 IL App (1st) 220122, ¶ 25 (following *Dorsey* and concluding that the defendant could not establish cause). Having found defendant failed to establish "cause" for failing to raise the claim in the current petition sooner, we decline to address the question of whether defendant was "prejudiced" by the failure. *People v. Walker*, 2022 IL App (1st) 201151, ¶ 31 (quoting *People v. Brown*, 225 Ill.2d 188, 207 (2007).

¶ 56    In so holding, however, "we are mindful that recent research on brain development in young adults has overwhelmingly found that emerging adults are 'more similar to adolescents than fully mature adults ***, more susceptive to peer pressure, less future-oriented and more volatile in emotionally charged settings.'" *People v. Ward*, 2021 IL App (1st) 181402-U, ¶¶ 31-38 (collecting studies). Clearly, *Miller* recognized that children lack maturity, have an underdeveloped sense of responsibility, are more vulnerable to negative influences, and have character that is not yet well formed. *Miller*, 567 U.S. at 471. Not only do these characteristics diminish a child's culpability, but the "distinctive attributes of youth diminish the penological justifications" for imposing life

without parole upon children. *Id*. at 472. However, this defendant, while trying to establish his link to *Miller* and related cases, cannot show the very impulsivity that is necessary. He had a well-paying job. Defendant did not know where Anabella, his ex-girlfriend, lived, but he obtained a key to her apartment when he borrowed her car, took a weapon, found her apartment, and let himself into her apartment while armed with a gun. He then confronted her and Edgar, her new boyfriend, and shot Edgar twice before warning her to not tell anyone what happened and running away. These actions are not the indicia of impulsive behavior.

¶ 57    Not only does defendant's proportionate penalties claim fail because he cannot establish the "cause" element but, at age 22 when he committed these offenses, he is not considered to be a "young adult offender." Although there is some recent precedent recognizing the potential to expand *Miller*'s holding to teens who have recently reached the age of maturity at the time that they committed their offenses, Illinois courts have rejected claims that an offender who was 21-year-old at the time of the criminal offense was entitled to have the sentencing court consider his age and treat him differently from other adult offenders when imposing a sentence. See, e.g., *People v. Rivera*, 2020 IL App (1st) 171430, ¶24 (affirming the circuit court's order denying the defendant leave to file a successive postconviction in seeking sentencing relief pursuant to *Miller* where the defendant was 23-years-old at the time of the offense, reasoning that there was no case law to support the proposition that an offender who committed an offense after reaching the age of 21 was entitled to receive special sentencing consideration and treatment different from other adult offenders for sentencing purposes); *People v. Humphrey*, 2020 IL App (1st) 172837, ¶¶ 33-35 (affirming a circuit court order denying the defendant leave to file a successive postconviction petition, reasoning that his argument that the discretionary life sentence he received for crimes committed at the age of 21 lacked merit where there was no legal authority to support his claim

that a life sentence imposed on someone who was 21-years-old or older was unconstitutional and a violation of the Illinois proportionate penalties clause and where there were no special circumstances present that would justify expanding *Miller*'s holding to him); but see *People v. Savage*, 2020 IL App (1st) 173135, ¶¶ 70-78 (reversing the circuit court's summary dismissal of the defendant's postconviction petition challenging the 85-year sentence he received for a murder he committed when he was 22 years old where there was evidence that his age in conjunction with his drug use made him the functional equivalent of a younger offender and where the circumstances of the crime suggested that he acted impetuously).

¶ 58 In rejecting such claims, courts have observed that legislative enactments have evidenced the Illinois legislature's intent to consider youthful offenders as those *under* 21 years of age. See, *e.g.*, 730 ILCS 5/3-3-9(a)(1.5) (West 2018) (parole review for under-21-year-old offenders is called "youthful offender parole"); Pub. Act. 100-1182 (eff. June 1, 2019) adding 730 ILCS 5/5-4.5-110; Pub. Act 101-288, § 5 (eff. Jan. 1, 2020) (amending 730 ILCS 5/5-4.5(110(b) and renumbering as 730 ILCS 5/5-4.5-115(b)) (amending the law to allow persons convicted of first degree murder from seeking parole after 20 years if the offender was under 21 years old at the time of the crime); 730 ILCS 5/5-4.5-95(b) (West 2018) (limiting class X sentencing to recidivist offenders to those "over the age of 21 years"); 705 ILCS 405/1-3(10), (2) (West 2018) (The Juvenile Court Act of 1987 defines a "minor" as a "person under 21 years" and defines an adult as "a person 21 years of age or older").

¶ 59 As defendant notes, this court has, in one case, held that a defendant who was 21 years or older may invoke *Miller*'s protection in a collateral challenge. In *Savage*, this court reversed the first-stage summary dismissal of a postconviction petition by a defendant who had been 22 years old at the time of the offense giving rise to the first degree murder and attempt first degree murder

convictions. *Savage*, 2020 IL App (1st) 173135, ¶ 2. The defendant argued that his 85-year sentence violated the proportionate penalties clause because the trial court failed to consider his long-term drug addiction in conjunction with his young age because it "made him the functional equivalent of a juvenile..." *Savage*, 2020 IL App (1st) 173135, ¶ 60. The defendant's allegation of a life-long drug addiction from the age of nine was corroborated by a hospital discharge report from when he was 15 years old, which indicated that he had been using drugs at the age of nine. *Id.* ¶ 72. The defendant was also diagnosed with dysthymic disorder and conduct disorder. *Id.* ¶ 33. The defendant further alleged that he was using drugs every day at the time of the offense, that he was attempting to rob a drug house at the time of the murder, and that his drug addiction left him susceptible to peer pressure and more volatile in emotionally charged settings. *Id.* ¶ 71. The defendant's history of mental health disorders and drug problems were presented at the defendant's sentencing hearing and supported by documentation. *Id.* ¶¶ 32-34.

¶ 60       However, in *People v. Guerrero*, 2022 IL App (1st) 210400, a case which defendant was 22 years old at the time that he committed the offense, the court recognized that "[t]he *Savage* decision was published on September 30, 2020, at a time when the law on this subject was still in the infant stage, and that decision appears to be the only reported decision of this court extending *Miller*-based sentencing protections [citation omitted] to a defendant over 21 years of age." *Id.* ¶ 29. The court in *Guerrero* also distinguished *Savage* on the basis that "there is nothing in the record to indicate that defendant's upbringing would have somehow increased his propensity for, or even explained his participation in, a gang lifestyle" or that "his cognitive abilities were someone affected or lessened by the circumstances of his upbringing." *Id.* ¶ 25.

¶ 61       Defendant's suggestion that *Savage* provides an avenue for him to obtain relief based upon *Miller* is distinguishable from the facts in the instant case. "First, the burden on defendant in this

case is higher as he is attempting to file a successive postconviction petition whereas the defendant in *Savage* filed an initial postconviction petition." *People v. Montanez*, 2022 IL App 191930, ¶ 61 (citing *People v. Horshaw*, 2021 IL App (1st) 182047, ¶ 134 (recognizing that the pleading requirements for successive postconviction petitions are higher than the pleading requirements for initial postconviction petitions)). Moreover, while defendant averred in his postconviction petition, for the first time, that he faced difficulties in his childhood, the allegations do not rise to the same level of drug addiction and mental health history as presented in *Savage*. In his PSI, defendant reported that his mental health was "good", he was not taking any prescribed medication; and he denied previously using illegal drugs and having a problem with alcohol. Also, there is nothing in the record to indicate that defendant's upbringing played any role in his decision to arm himself with gun, enter the apartment of his ex-girlfriend uninvited and without permission to use the key, and engage in a physical fight with the current boyfriend of his ex-girlfriend, then repeatedly shoot him in the same room where defendant's young son was sleeping, and told his ex-girlfriend "not to tell anybody" before he ran out of her apartment.

¶ 62    Here, based on the current legal landscape and relevant details contained in the record, we are unable to conclude that the 56-year sentence that defendant received for crimes he committed when he was 22 years old is unconstitutional. Moreover, although it is true that defendant's 56-year sentence is a *de facto* life sentence, defendant did not establish the element of "cause" in the cause-and-prejudice test in order to succeed in his third successive postconviction petition. Accordingly, the trial court properly denied defendant's motion for leave to file his successive postconviction petition.

¶ 63                                    CONCLUSION

¶ 64    For the foregoing reasons, we affirm the judgment of the circuit court.

1-21-1405

¶ 65    Affirmed.